==========================================================================

# Deposition of:

# P.J. Tanner

==========================================================================

## Nelson
## v.
## BCSO, et al

## Case #: 9:18-CV-2962-DCN-BM

## August 24, 2020

==========================================================================



## Magnolia Reporting, LLC

P.O. Box 61011
North Charleston, SC 29419
(843) 303-9141
www.MagnoliaReporting.com



Page 70

1   circumstances to actually go outside of the chain of

2   command to report incidents of harassment or other

3   workplace discrimination directly to OPR?

4       A.    Yeah.   I mean, there's -- there's a lot of

5   avenues for our deputies to make, you know, claims of

6   discrimination or any other claim.   I mean, there are

7   opportunities galore with that.   And I would not

8   consider that a violation of policy because they went

9   outside their chain of command, if they were looking

10  for relief and didn't feel like they could find a

11  relief in-house.   But I have on open-door policy with

12  all of my staff.   And they understand and know that my

13  door is always open, and they can -- all of my contact

14  information is on our recall roster.   They have any

15  opportunity to contact me if they're uncomfortable with

16  contacting someone else within the organization.

17      Q.    Has that happened?

18      A.    Sure.   Absolutely.

19      Q.    With regard -- with regard to racial

20  discrimination?

21      A.    No.

22      Q.    With regard to sexual discrimination?

23      A.    No.

24      Q.    So Brian Baird has been the head of OPR since

25  around 2011 or '12, right?

1    A.    I think we start -- we started using him for
2   internal affairs investigations -- we had three --
3   2010, 2011.

4    Q.    And he told us last week when we talked with
5   him that he's never heard of an instance of workplace
6   harassment at Beaufort County.  Does that sound right
7   to you?

8    A.    Well, I mean, if it did not rise to his
9   level, then he may not know about it.  I mean, I can't
10  speak for Brian.  I'm just responding to your question.

11   Q.    Okay.  But would you -- would you say that
12  there's never been an incident of workplace harassment
13  at Beaufort County since 2010 or '11?

14           MS. LOHR:  Object to the form.
15  BY MS. BLAZER:
16   A.    I don't recall.  But I can't -- you know, I'm
17  not speaking for Brian.  But I don't recall any claims
18  of any kind of workforce harassment coming to me
19  with -- anytime -- anytime recently, so...

20   Q.    Okay.

21   A.    I'm actually trying to remember if there were
22  any.  Brian would know if it went to an internal
23  affairs investigation.  But if it was -- if it was a,
24  you know, command officer review or inquiry, he may not
25  know about it.

1      A.    I'm sorry.  There's two brothers, so -- I

2    mean, you can definitely tell them apart.

3      Q.    Right.

4      A.    But everybody has nicknames, and everyone

5    gets attached to nicknames.  But we're going to talk

6    about Big Pru, which is James Prusinowski?

7      Q.    That's right, going to talk about Big Pru.

8    And Big Pru is nicknamed justly, right?  He's the

9    bigger of the Prusinowskis?

10     A.    He is.  He's definitely the bigger one.

11     Q.    Okay.  Now, Prusinowski's had -- you know, I

12   don't -- I don't -- actually, let's see.  When did

13   Prusinowski -- do you know when Prusinowski became a

14   member of the sheriff's office?

15     A.    I rehired him a year ago.

16     Q.    Okay.  But before that -- I mean, he'd

17   been -- he'd been around for a while because I've

18   got -- I've got disciplinary records going back to

19   2012; does that sound right?

20     A.    You know, I'd have to go back and look at

21   them.  I don't -- I don't know.

22     Q.    Okay.

23     A.    I don't recall.  I only recall two situations

24   involving him.  I mean, whatever the other stuff was

25   didn't -- didn't reach my level.

Page 171

1      Q.   Yeah, I mean, some of it looks pretty minor,
2   you know, car accident-type stuff.
3      A.   Yeah.  Well, I mean, all of those are written
4   up the same way.
5      Q.   Right.
6      A.   It's just most -- a lot of them don't make it
7   to me unless it's something serious.
8      Q.   Well, would it be something serious if
9   somebody got a reprimand and a rank loss?
10     A.   I mean, it depends on the situation.  Can
11  you -- can you -- is that something you're showing on
12  the screen now?
13     Q.   You should be able to see it.  If you look at
14  this disciplinary action form, can you see that it
15  says, James Prusinowski at the top?
16          MS. LOHR:  Hold on a second.  We might could
17      turn this computer around.
18          MS. BLAZER:  Okay.
19          (Discussion held off the record.)
20  BY MS. BLAZER:
21     A.   I can -- I can read it a little bit better
22  when I stand right here at the screen.  What, exactly,
23  are you asking on?
24     Q.   Okay.  So we're talking about -- the
25  violation is personal conduct unbecoming.  Is that what

Page 172

1  you see at the top of the page there?

2       A.   I do.

3       Q.   Okay.  And if I look at the supervisor's

4  comments it says that he should be placed on a

5  probationary status for 12 months.  Then, when you look

6  at the branch commander's remarks, he agrees and

7  recommends that Prusinowski get counseling for marital

8  issues.  Do you see that?

9       A.   Yeah.  And you're talking about -- which one

10  are you talking about now?  Was it -- is it Morrison,

11  or are we down to Baxley?

12       Q.   I was looking at -- I was looking at what I

13  believe Horton had said, and then -- but next, after

14  Horton was Morrison who said that the branch captain's

15  remarks were appropriate.  Then next we get to Baxley,

16  whom recommends a reduction to PFC.  And he writes, A

17  corporal is expected to be a veteran officer,

18  trustworthy, and capable of guiding and leading younger

19  troops.  Prusinowski's blatant attempt to mislead his

20  supervisor violates this.

21            Do you know what he's talking about there?

22       A.   I do not.  But that's not unusual for -- for

23  Colonel Baxley.

24       Q.   What do you mean?

25       A.   I mean, he -- he can get -- he can exaggerate

1  a little bit and get a little overzealous in some of
2  his comments.

3       Q.   Okay.  So you would just assume, on the basis
4  of who's making the comment, that it's an overzealous
5  representation of what Prusinowski did?

6       A.   No.  It had to be based on connectivity with
7  that officer as well.  I mean, Colonel Baxley is our
8  emergency management director for the sheriff's office.
9  And I don't know that he's ever supervised -- well, I
10  can pretty well say he has never supervised Jason
11  Prusinowski or knows anything about his work ethic or
12  conduct on a regular basis.  But the other managers on
13  that page would have direct knowledge of Prusinowski's
14  work record.

15       Q.   Okay.  But do you think that Baxley would
16  just pull out of thin air the claim that Prusinowski
17  had attempted to mislead his supervisor?

18       A.   You would have to ask him that question.  I
19  just know that, you know, his comments on there in
20  relation to the other people that work with
21  Prusinowski.

22       Q.   Uh-huh.

23       A.   His recommend -- the recommendation that he
24  made was not accepted.

25       Q.   Understood.  Okay.  So I think -- correct me

Page 174

1  if I'm wrong -- that that's the last significant issue

2  that Prusinowski had prior to 2018.  Does that sound

3  right to you?

4      A.   You're asking me to remember something like

5  that, and I -- the answer is, I don't know.  If you've

6  got a particular question about another case --

7      Q.   Well, if -- do you agree with me that --

8      A.   I don't even know what year that is.  I can't

9  even see the writing on that.

10     Q.   That was 2012.

11     A.   All right.  So now you're asking is there's

12  something that happened between '12 and '17?

13     Q.   No, I was -- I was saying that the next time

14  Prusinowski had any kind of issue was in 2018; does

15  that sound right?

16     A.   Unless you've got -- I mean, I'm going to

17  have to assume that you're not trying to mislead me.

18  And if you've got another --

19     Q.   I appreciate that.

20     A.   If you've got another incident that happened

21  between those dates, I'm sure you'll share it with me.

22     Q.   I do.  I don't have a PCS or -- I don't have

23  a disciplinary form for it, but I do have media records

24  that indicate that in 2018 Prusinowski was arrested for

25  CDV.  Do you recall that?

Page 175

1        A.    By Bluffton P.D., yes.

2        Q.    Yes, sir.  And you'd agree with me that a CDV

3   charge is -- would be a serious problem for a law

4   enforcement officer?

5        A.    If you committed the crime, yes.

6        Q.    Right.  And --

7        A.    But if you didn't, no.

8        Q.    Agree.  And you would agree with me that your

9   agency conducted an inquiry into the incident that was

10  parallel to the inquire by Bluffton?

11       A.    I don't know if they were parallel.  I think

12  Bluffton pretty well did their investigation that

13  night.  And, you know, of course, our -- our review or

14  inquire or OPR investigation would have taken a lot

15  longer than just that night to make a determination or

16  a decision.

17       Q.    Right.  Because --

18       A.    But I might add that I think those charges

19  against Prusinowski were dropped and dismissed.

20       Q.    I think you're right.  And -- and I think

21  you're -- you're right, that your investigation -- your

22  OPR investigation took longer because -- correct me if

23  I'm wrong.  In that case, I believe it was Captain

24  Averill who conducted the IA.

25       A.    I don't remember.

Page 176

1    Q.    Okay.  You don't have any independent
2  recollection that that's what happened?
3    A.    I mean, I know the nuts and bolts of, you
4  know, what happened during the case.  But as -- I don't
5  remember who did the OPR investigation.
6    Q.    Okay.  But if I told you it was Averill, you
7  don't have a reason to believe that that's anything
8  other than true?
9    A.    I don't have any reason to believe that you
10  would lie to me or mislead me.
11    Q.    It would be pretty silly.  So -- and would
12  you agree with me that in the course of that
13  investigation -- internal affairs investigation,
14  Prusinowski was polygraphed?
15    A.    I would -- I assume so.
16    Q.    Okay.  Because in -- in a he-said, she-said
17  kind of situation, that's the sort of situation where
18  IA is likely to conduct a polygraph?
19    A.    And it was probably a statement verification.
20    Q.    Okay.  And you know that Lieutenant Baird
21  conducted that polygraph?
22    A.    I'm -- based on what you're telling me, I'll
23  believe you.  Go ahead.
24    Q.    Are you aware that your lawyer commissioned
25  an expert report to evaluate the polygraphs conducted

Page 177
1    by your agency?

2         A.    That my lawyer?

3         Q.    Yes, sir.

4         A.    Okay.  Talking about Mary?

5         Q.    Yes, sir.

6         A.    About that case?

7         Q.    About a series of polygraphs conducted in

8    internal affairs investigations.

9         A.    For a series?  Now -- now, let me answer that

10   question as easy as I can.  No, I'm not aware that

11   Mary --

12        Q.    Okay.

13        A.    -- asked for an expert.

14             THE WITNESS:  Now we can move on to the next

15        because I didn't know you did.

16   BY MS. BLAZER:

17        A.    But, okay.  If she did, she did.

18        Q.    Okay.  I think I know the answer to my next

19   question that I had written down, which is, have you

20   looked at that report?

21        A.    I have not.

22        Q.    Okay.  So then you -- you don't know that

23   your expert says that Baird gave Prusinowski a passing

24   score when his reaction should have more accurately

25   been classified as inconclusive?

Page 179

1   testimony is -- is pretty accurate.  But if I told you
2   that the expert that the county hired in this case said
3   Averill and Baird are wrong, does that cause you any
4   heartache?
5       A.   Depends on what they're wrong about.
6       Q.   They're wrong that he passed.
7       A.   I wish I was -- knew enough about the
8   polygraph to respond to that, but --
9       Q.   Okay.
10      A.   -- I don't.
11      Q.   In reviewing for today's deposition, did you
12  have the chance to review any of the video of
13  Prusinowski's polygraph?
14      A.   I did not.
15      Q.   Okay.
16          MS. BLAZER:  Mary Ann -- and this has
17  previously been made an exhibit in another deposition,
18  but, Mary Ann, would you please play -- I'll tell
19  you -- it's the only video.
20          (Discussion held off the record.)
21          (A brief recess was taken.)
22          (Video played.)
23  BY MS. BLAZER:
24      Q.   So, Sheriff, I assume that's the first time
25  you've ever seen that video?

Page 190

1    performance evaluations.  So he was turned down for
2    promotion.
3         Q.   But you didn't see this when you were
4    chairing his board?
5         A.   No, because I don't vote.  I chair the board.
6         Q.   Okay.  All right.  And so you don't know if
7    he had to be polygraphed in relation to this incident?
8         A.   I do not.
9         Q.   Okay.  And he's a white male?
10        A.   He is.
11        Q.   Okay.  Let's talk about Roper.  Do you recall
12   that an incident in which -- in which Roper, who I
13   believe is -- I don't know -- I don't know Deputy
14   Roper's rank, I apologize.  But Deputy Roper didn't
15   report it when his service weapon went missing?
16        A.   Deputy Roper is a major within the sheriff's
17   office in our admin division.
18        Q.   Okay.
19        A.   I know he had a weapon stolen out of his
20   vehicle.  And part of his punishment was, he had to
21   reimburse the county for the cost of his weapon.
22        Q.   How long did it take for him to report that
23   weapon being missing?
24        A.   I don't know.  That was -- that was handled
25   by -- by his supervisor.  I think it was Colonel Brown

Page 191

1   at the time.

2        Q.   Okay.  So you say that the service weapon was

3   stolen out of his -- was it an unmarked car?

4        A.   I was an unmarked vehicle, yes.  I think he

5   had some personal stuff stolen as well.

6        Q.   Uh-huh.  Is there a policy that says how long

7   you have to report a service weapon going missing?

8        A.   I don't -- I don't recall it exactly being

9   part of the policy, no.  I think it's common sense.

10       Q.   Right.  Common sense is, that's a big deal

11  and you report it right away, right?

12       A.   I mean, it would be common sense once you

13  determine that your -- that your firearm has been

14  stolen, you need to report it.

15       Q.   Right.

16       A.   But I don't know -- I don't know the

17  circumstances surrounding his vehicle break-in.  I

18  don't know, was it hours, days or whatever before it

19  was reported?

20       Q.   Uh-huh.  What about -- Roper is not only

21  deputy to have had a service weapon go missing, is

22  he?

23       A.   No.  My chief deputy, Mike Hatfield, did too.

24       Q.   Tell me about that.

25       A.   He had it stolen out of his car.

Page 192

1    Q.    When was that?

2    A.    I don't remember the dates.  I can get that

3  information for you, but I don't remember the dates.

4  It's been -- it was around the same time that Major

5  Roper had his gun stolen.

6    Q.    Uh-huh.  Was -- was -- do you recall if

7  Hatfield's vehicle was secured at the time that the

8  firearm was stolen?

9    A.    Being -- being secured and damaged is two

10  different things.  But I don't recall damage to the

11  vehicle.

12    Q.    Okay.  Well, I guess what I'm asking is, when

13  the vehicle was -- had the service weapon taken out of

14  it, was Hatfield's vehicle locked?

15    A.    I don't know, but there was no damage to the

16  vehicle.

17    Q.    Okay.  All right.  I see what you're saying.

18  So we can infer that it was not locked if there was no

19  damage to it?

20    A.    We can infer that it was locked and

21  there's -- I mean, there are ways to get in locked cars

22  without causing damage.

23    Q.    Fair enough.  All right.  How long was it

24  between when the service weapon went missing and when

25  Hatfield reported it missing?

Page 193

1        A.    I don't recall.

2        Q.    What discipline, if any, did Hatfield face

3    after the service weapon went missing?

4        A.    He had to reimburse the county for the cost

5    of the weapon.  And I believe there was some probation

6    time.  Same with Roper.

7        Q.    Okay.  O'Neill -- sorry.

8        A.    Oh, and by the way, Mike Hatfield and Major

9    Roper are both white males.

10       Q.    Thanks.

11             Do you recall an incident in which Patrick

12   O'Neill was -- had a complaint filed against him by a

13   woman who alleged that he had sex with her while he was

14   on duty?

15       A.    I vaguely remember.  I don't remember the

16   details, but I remember a complaint made against

17   Patrick O'Neill, yes.

18       Q.    Do you recall whether that complaint was

19   substantiated or not?

20       A.    Do not.

21       Q.    If it -- if Patrick O'Neill had sex with a

22   woman while he was on duty, would that be a violation

23   of any general order?

24       A.    If, in fact, it happened, it would be.

25       Q.    Okay.  What would -- what would be an