IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| Selena Nelson,<br><br>                             Plaintiff,<br><br>                    v.<br><br>Beaufort County Sheriff's Office, Lieutenant Brian Baird, and Sheriff P.J. Tanner, individually and in their official capacity,<br><br>                             Defendants. | C/A NO: 9:18-CV-2962-DCN-MHC<br><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** |

Plaintiff, Selena Nelson, ("Ms. Nelson") submits this Memorandum in Opposition to Defendants' Beaufort County Sheriff's Office ("BCSO"), Lieutenant Brian Baird, ("Lt. Baird") and Sheriff P.J. Tanner, ("Sheriff Tanner")(collectively "Defendants") Motion for Summary Judgment (ECF 59). Ms. Nelson commenced this employment discrimination action on November 1, 2018, asserting claims against the Defendants under Title VII of the Civil Rights Act of 1964, as amended ("Title VII")[1], 42 U.S.C. § 2000e, et. seq., and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, ("§ 1981") as well as state law claims for defamation. For the reasons set forth below this Honorable Court should deny the Defendants' motion.

**FACTUAL BACKGROUND**

Ms. Nelson is a Black lesbian who was employed by the Defendants for over thirteen (13) years. Because of her race and sexual orientation, the Defendants harassed her, terminated her, and

---

[1] After the Supreme Court's June 15, 2020, decision in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, (2020). Plaintiff filed a Motion to Amend her Complaint to include a Title VII claim based on sexual orientation. (ECF No 47) The Court granted Plaintiff's motion. (ECF )

destroyed her reputation as a law enforcement officer, making it effectively impossible for her to work in her chosen profession. The Defendants unapologetically claim they were entitled to take the actions they took because they have a "zero-tolerance policy for lying." (ECF 59-1, p 9) However, this is clearly not the case, as numerous white male officers have engaged in egregious acts of dishonesty with little consequence. Moreover, Defendants' claim that Ms. Nelson was dishonest is predicated on a fatally flawed investigation conducted with bias, discriminatory animus and with no regard for Ms. Nelson's constitutional protected rights for due process and equal protection.

**A disproportionate punishment based on a racially biased complaint and investigation**

A store clerk submitted an electronic complaint form to BCSO alleging unprofessional conduct by Ms. Nelson when she was off duty. (ECF 59-8, p 35-38) The clerk claimed that while off-duty and in uniform, Ms. Nelson "bullied and intimidated" him by raising her voice and requiring him to refund her in cash for a defective product. *Id*. He further claimed she used profanity, specifically the word "ass." *Id.*  By the Defendants' own admissions, "it's not the crime of the century. But guess what? Lying on an internal affairs investigation will get you terminated." (Ex 1, Depo Averill, 99:1-6) The citizen complaint against Ms. Nelson came from a white male store clerk named Tyler Weaver. ("Mr. Weaver") (ECF 59-8, p 35-38). The complaint was received and assigned to Internal Affairs ("IA") also known as the Office of Professional Responsibility ("OPR") by Chief Michael Hatfield. ("Chief Hatfield")(Ex 1, Averill Depo p. 31-32) At that time, Sheriff P.J. Tanner's ("Sheriff Tanner") IA matters were handled by Lt. Baird and Captain Matthew Averill ("Capt. Averill"). Capt. Averill had been handling polygraphs and IA investigations since 2000 and Lt. Baird had been handling IA matters and performing polygraphs since 2010. (Ex 2, Tanner Depo p. 70-71)(Ex 1, Averill Depo p. 52)

### A racially biased complaint

Mr. Weaver's complaint was rife with racially charged words and implications. He stated that Ms. Nelson's behavior was "thuggish[2]," "intimidating," and "aggressive." (ECF 59-9 p. 35) He pointed out she had a "glock" on her person and he repeatedly described her request for a refund as a "shakedown," "robbery," and "extortion." *Id*. He claimed she demanded "CASH MONEY." He admitted he took the cash drawer in the back room, because he did not want to count the money in front of Ms. Nelson. Mr. Weaver's complaint relied heavily on racially coded language and stereotypes, all of which should have been well understood by an internal investigator with Lt. Baird's many years of experience.

### Lt. Baird's bias investigation and discriminatory animus

Mr. Weaver's complaint was assigned to Lt. Baird. It was Lt. Baird's job to investigate the matter, prepare a report, and submit his findings to Sheriff Tanner. (Ex 3, LETC Report p. 2). Lt Baird was aware that Sheriff Tanner was going to rely upon his report to make a decision regarding Ms. Nelson. *Id*. Despite this, Lt Baird's report was biased and left out critical information. When he testified before the Law Enforcement Training Council, ("LETC") ("Training Counsel") also known as the South Carolina Criminal Justice Academy.("SCCJA")  Lt Baird stated he preferred to speak with witnesses "in person so [he] can observe them" to "see their reactions" as this can be helpful to determine their truthfulness, credibility, and any bias they might have. *Id*. Yet, he admitted to the Training Council he never met with Mr. Weaver and only spoke to him over the telephone. (Ex 3, LETC Report p. 3) He admitted that he did not conduct any in-person interviews

---

[2] *See*, The Racially Charged Meaning Behind The Word 'Thug,' Interview with John McWhorter, *All Things Considered*,  https://www.npr.org/2015/04/30/403362626/the-racially-charged-meaning-behind-the-word-thug,  last accessed April 19, 2020 ("[T]he truth is that thug today is a nominally polite way of using the N-word. Many people suspect it, and they are correct. When somebody talks about thugs ruining a place, it is almost impossible today that they are referring to somebody with blond hair. It is a sly way of saying there go those black people ruining things again. And so anybody who wonders whether thug is becoming the new N-word doesn't need to. It's [sic] most certainly is.").

with *any* of the individuals regarding Mr. Weaver's complaint, except Ms. Nelson. *Id*. Lt. Baird testified that the first interview of Ms. Nelson was approximately "two hours and 47 minutes," yet he spent a mere 25 minutes combined interviewing all of the other witnesses. *Id*.

He interviewed Ms. Nelson to determine if she was yelling in public and whether she used the word "ass." (ECF 59-8 p 4). This interview extended over nearly three hours during which, Lt. Baird repeatedly raised his voice and threatened Ms. Nelson with dire consequences. (Ex 20, Excerpts of Baird's 1st interrogation of Ms. Nelson) After this aggressive and lengthy interrogation, he required her to take a polygraph examination with Capt. Averill. Rather than try to neutralize the atmosphere created by Lt. Baird's aggressive questioning, Capt. Averill expressly referenced Lt. Baird during the polygraph, after which he determined her answers indicated deception. Thereafter, she retired to meet with Lt. Baird, who for the very first time informed her of the context in which she was alleged to have used the word "ass." Remembering the comment, she laughed and said she did use the word "'ass" as a compliment of Ms. Vargas' salesmanship ("you sold your ass off.") Based upon her admission, "to finally using the word "ass', the interview was ended." (Ex 21, Excerpts of Baird's 2nd interrogation of Ms. Nelson) Lt. Baird submitted his findings to the Sheriff. (ECF 59-8)

Despite claiming to be an experienced IA investigator, he admitted, "As a general rule, he does not perform a background check on a witness to determine whether they have been arrested or whether they have had encounters with the officer in the past." *Id*. In addition to Mr. Weaver's complaint, Lt. Baird also received an online complaint from a woman who identified herself as "Emma Lipinski." (ECF 59-8 p. 41) In her complaint, Ms. Lipinski claimed she was a customer and witnessed the exchange between Ms. Nelson and Mr. Weaver. *Id*. Not until after Ms. Nelson had been fired, did it come to light that Ms. Lipinski was Mr. Weaver's mother and was not an eye

witness. (Ex 4, Baird Depo, p 85) Furthermore, had Lt. Baird done a background investigation he likely would have learned that Mr. Weaver's mother filed a false complaint, and he could have questioned Mr. Weaver about it. It escaped Lt. Baird, that Mr. Weaver never mentioned an eyewitness. Lt. Baird sent an email to Ms. Lipinski seeking an interview, but received no response and did no other follow-up with her. (ECF 59-8).

Lt. Baird also intentionally left out of his report critical information from Mr. Weaver's boss, Store Manager, Lindsey Vargas, ("Ms. Vargas") that corroborated Ms. Nelson's account and contradicted Mr. Weaver's accounts. In the transcript of Lt. Baird's telephone conversation with her, Ms. Vargas reports a very different encounter than the one Mr. Weaver described in his complaint. Ms. Vargas stated that she was on the phone with Ms. Nelson at the same time that Mr. Weaver was on the phone with the store's owners. (Ex 5, Tr Vargas call, p 4) Ms. Vargas told Lt Baird at the time she was speaking to Ms. Nelson, she never heard Ms. Nelson raise her voice or saying anything negative. *Id*. Furthermore, she stated that Ms. Nelson was "quite professional." *Id*. at p 5. Lt. Baird specifically asked her, "While she was on the phone with you, did you ever hear her saying, like, to the effect of, I want cash, give me my cash, things like that?" *Id*. To which, Ms. Vargas responded, "I heard her say, debit it out of my account the same day, same as cash. But that was all. Because, like I said, I was at a restaurant, so there was noise going on…." *Id.* In fact Lt Baird made a point to ask her, "Do you remember her making a comment to you, something to the effect of the-- the reason she bought the two air purifiers is something like you sold your ass off or something like that." Id. at p 6. Ms. Vargas told him she did not. *Id*.

Not only did he leave Ms. Vargas's account out of his report, Lt. Baird implied that Ms. Nelson and Ms. Vargas were having an lesbian relationship. He asked Mr. Weaver, "Do you know if [Ms. Vargas] and her have any kind of, like, relationship or anything like that? Are they friends

outside work or anything; do you know?" (Ex 6, Tr. Weaver Call p. 6) Mr. Weaver responds that he was not sure. *Id.* Lt. Baird then makes a point of telling Mr. Weaver, "I was kind of wondering, because you know, like, when I was looking at it, I was thinking, Well, hell, if I was a manager of a store and another store called me, I'd probably have their cell phone number. And I'd definitely answer it. And then with her not answering your call, but answering Officer Nelson's call, it seemed kinda odd." *Id.* Lt. Baird interrogated Ms. Nelson about whether she had a personal relationship with the Store Manager.(Ex 20, Excerpts Baird interview Nelson, 86:3-15)

Lt Baird, who is a white male, exhibited that he has a racial bias against African Americans in his Facebook posts. (Ex 7, Baird's FB Posts) In June of 2020, he came under public scrutiny for several public posts on Facebook. One of his posts showed an image of Barack Obama and Michelle Obama with Baird's message: "They sure did stoke the flames of racism and did their best to divide America and help his Muslim Brothers." Id. Baird's Facebook had a shared image stating, "If we dislike a black person, we're racist and if a black dislikes whites, it's their 1st Amendment right." *Id.* When asked about these posts at his deposition, Baird testified it was his political opinion.(Ex 4, Baird Depo, 141:10-18).

Lt. Baird's racial bias against Ms. Nelson is also exhibited in an exchange between him and Capt. Averill that was caught on video, which was turned over to Plaintiff's Counsel in response to a request for records of polygraph examinations conduct in  BCSO IA investigations. The purpose of the request was to compare how Lt. Baird and Capt. Averill scored charts for a Black lesbian woman, with their scoring results of white heterosexual male officers. In the case of Officer James Prusinowski ("Prusinowski"), and in the view of Defendants' own expert witness, Lt. Baird and Capt. Averill incorrectly scored the results in their white heterosexual male colleague's favor. (Ex 8) (Ex 22) To add insult to this legally cognizable injury, the video of

Prusinowski's test captured the following exchange by Lt Baird and Capt. Averill, about Ms. Nelson. At the time Lt. Baird and Capt. Averill were involved in the IA investigation of Prusinowski arising out of his arrest for domestic violence. Ms. Nelson was working for Bluffton Police Department and she transported Prusinowski's wife to the jail. Lt Baird and Capt. Averill discussed discrediting Ms. Nelson, apparently oblivious to the cameras recording their conversation:

> **Lt Baird:** Have you listened to all the recordings yet?
>
> **Capt. Averill**: Haven't got 'em. But I talked to Joe Babkiewicz yesterday. He said, "L3 is here today trying to fix the server." He said, "As soon as they're done, I'll call you." And Joe I trust. I trust Joe. Joe will get me the shit.
>
> **Lt Baird**: I can't wait.
>
> **Capt. Averill**: I'm waiting to see if Pruz*, I asked him, "Was Nelson there?" And he goes, "I didn't see her there." He said, "Now I'm not saying she wasn't." He said, "Because when I got to the PD, she was in Nelson's car. My wife." He goes, "So, I don't know how she got there unless Nelson was at the house." Well, if you read the report. In the beginning of the report, they're talking about how Nelson was told this and was told this by the wife. Well, I want them to try and give me something, get me some recordings without hers.
>
> **Lt Baird**: I want to hear the wife tell her that. You know what I think you're going to have? You're either going to have all of her recording didn't record. That's what I think.
>
> **Capt. Averill:** And then we're going to have to subpoena them. And then, how's it going to look if she doesn't have any recording? And she's there. It's going to look terrible. For them.
>
> **Lt Baird:** It's going to look just like it is. She is a documented liar. Period.
>
> **Capt. Averill**: Well, I agree.
>
> **Lt Baird**: Then, it's time to call the Training Council and say, "Told you so." Because...
>
> **Capt. Averil**l: Mm-hmm. Good job giving her her shit back.
>
> **Lt Baird**: Yeah. Granted, Nelson isn't the biggest liar in the world. But when it comes to law enforcement, when you're lying after you get your OPR (inaudible), you're history. And it was worth taking her certification.
>
> **Capt. Averill**: Without a doubt. Baxley said he saw her the other day and said she looks like shit. He said she's got a big pus gut. Her belly's hanging over her gun belt. (Ex 8, Plaintiff's Polygraph Expert Report)

**Defendants reported to Training Counsel that Ms. Nelson engaged in misconduct, yet they did not report other white heterosexual officers who engaged more egregious acts of misconduct**

After Ms. Nelson was terminated, the Defendants attempted to revoke her law enforcement certification so that she could no longer work as a police officer.  Yet they did not do the same with similarly situated white heterosexual male officers. When a law enforcement officer's job ends, his employer must notify SCCJA also known as the Training Counsel of the separation and state "the facts and circumstances leading to the separation." S.C. Code Ann. Regs. § 38-009 (2014). Agencies use a standardized Personnel Change in Status (PCS) Report form. If agencies notify CJA that an officer's separation is related to misconduct, pursuant to S.C. Code Ann. Regs. § 38-004 the officer is entitled to a contested case hearing before SCCJA. After being given an opportunity to be heard, the Training Council can take action against the officer's certification (up to permanent denial of certification) or find that the officer did not engage in misconduct and reinstate the certification.

The Defendants reported to the Training Counsel that Ms. Nelson engaged in dishonesty. The Training Counsel disagreed, finding it unclear whether Ms. Nelson was dishonest when she said she did not use the word "ass," or whether she was focused in her reply to Lt. Baird's interrogation on what she said to Mr. Weaver and not considering what she said to Ms. Vargas. (Ex 3, LETC Report 8-9) In coming to that conclusion, the LETC relied upon the second interview when Ms. Nelson was told the specifics of the allegation. *Id.*  In particular,  Lt Baird finally tells her what Mr. Weaver alleged she said, "What this guy is saying is that while you were talking to [Ms. Vargas], you told [Ms. Vargas],  the reason I bought those two air purifiers because you sold your ass off." *Id.* The Training Counsel noted, once she was told the specifics of the allegation she, after an audible laugh, stated "[w]ell, um, yeah, I - I told her how great she was and like I said

probably did say to her 'ass' but nothing derogatory for him. But I did tell her she sold her ass off." *Id*. She explained she was "just too focused on [Mr. Weaver] because of the situation, not on [Ms. Vargas] because this was never an issue with [Ms. Vargas]" *Id.*  Having reviewed the totality of the interview without bias, the LETC declined to hold that Ms. Nelson engaged in dishonest misconduct and reinstated her law enforcement certification. *Id*.

## The Defendants Orchestrated a Damaging Article

Ms. Nelson was terminated in August of 2017, and there was no contemporaneous local media coverage about her termination. It was not until a few weeks after her hearing[3] that Ms. Nelson's termination became front page news. (Ex 9, Island Pck Article) The article didn't run until January of 2018, just a few weeks after SCCJA notified the Defendants they were not going to revoke Ms. Nelson's law enforcement credentials. Plaintiff contends that the Defendants orchestrated the publishing of this story because their efforts to have Ms. Nelson's credentials pulled by the Training Counsel were unsuccessful. The article was published a few days after the Island Packet submitted a Freedom of Information Act (FOIA) request for her IA file. The FOIA request was extremely specific, listing her entire IA and any videos, the existence of polygraph video was known by only a small number of people at BCSO. (Ex 10, Island Pck FOIA) In the dozens of FOIA requests by the Island Packet about discharged officers, before the one that led to the article about Ms. Nelson, not one, made a request for "video" and "entire IA file." Defendants have offered no other plausible explanation for the specificity and timing of the Island Packet's request. The article paints Ms. Nelson as a dishonest officer who was fired by Defendants but was

---

[3] Ms. Nelson's hearing before the Training Counsel was in late December of 2017, at the hearing the parties were advised that the Training Counsel was not going to revoke her certification.  However, the written opinion was not completed until March 22, 2018. (Ex 3)

later hired by Bluffton. The article was clearly intended to smear Ms. Nelson and interfere with her new employment.

## The Defendants continued to defame Ms. Nelson

Unfortunately, the Defendants efforts to destroy Ms. Nelson's reputation didn't end with the newspaper article. As noted above, after her termination, Plaintiff had obtained employment at Bluffton Police Department. She was hired by Joseph Manning who was the Chief of the Town of Bluffton's Police Department. (Ex 11, Manning Decl.) Chief Manning was aware, when he hired Ms. Nelson that Sheriff Tanner had reported on Ms. Nelson's PCS that he terminated her for "misconduct" involving "[d]ishonesty/untruthfulness with respect to his/her employer" *Id*. Despite Sheriff Tanner's allegations, Chief Manning made the decision to hire Ms. Nelson because, in his opinion, whether she was untruthful about using the word "ass" was insignificant. *Id*. Sheriff Tanner expressed his displeasure to Chief Manning that he hired Ms. Nelson. *Id*. In May of 2018, Chief Manning resigned to accept the position of Police Chief in Sevierville, Tennessee. Not long after that Ms. Nelson was terminated by Bluffton. Indeed, shortly after Chief Manning left, Lt. Baird reached out to Officer Joseph Babkiewicz[4] about Ms. Nelson and encouraged him to review the files that Beaufort had on Ms. Nelson. (Ex 4, Depo Baird p. 173) Not surprisingly, shortly thereafter, Ms. Nelson was terminated by Bluffton and has been unable to obtain a job in law enforcement since.

## Similarly situated white heterosexual males were treated more favorably.

### *OFFICER JAMES PRUSINOWSKI*

*Officer James Prusinowski ("Prusinowski") received disciplinary action on May 2, 2012, for "Personal Conduct-Unbecoming" (Ex 12, IA Prusinowski) for "marital issues". Prusinowski was placed on probation for six months and was required to seek marital counseling. He received a demotion to PFC as a result of his "blatant attempt to mislead his supervisor." Id.*

---

[4] Officer Joseph Babkiewicz became Ms. Nelson's supervisor at Bluffton after Chief Manning left and is the same individual the Capt. Averill and Lt. Baird reference as the officer that will get them "the shit.."

*Prusinowski was arrested for a domestic violence incident on June 13, 2018 by the Bluffton Police. Sheriff Tanner placed him on administrative leave pending the outcome of the IA investigation. In her police statement, Prusinowski's wife told officers that "her husband had grabbed her by the arm". Moreover, the arresting officer observed "a red mark on her right wrist." Id. at 2. In his police statement, he claimed that "at no time did he put hands on" his wife. Id. at 22. Prusinowski maintained this narrative in his statement made to IA. Id. at 27-28. He was subject to a polygraph examination. (Ex.12, IA Prusinowski,). The results of the polygraph were listed "No Deception Indicated." Capt. Averill conducted a "Quality Control" check of the polygraph and came to the same conclusion. Id.  However, both Defendants' and Plaintiff's polygraph experts determined Capt. Averill and Lt Baird scored the results incorrectly and Prusinowski should not have been given a passing score.*

*In 2019 Deputy Prusinowski was arrested for DUI and Unlawful Conduct Towards a Child. (Ex. 2, Depo Tanner p.170-176). No disciplinary action was taken, he was not subjected to a polygraph, and Deputy Prusinowski was allowed to resign after his arrest and was later hired back. Id. Sheriff Tanner reported on Prusinowski's PCS that it was routine separation . Id.*

### OFFICER STUART MANKIN

*On or about, April 8, 2011, Corporal Stuart Mankin's ("Mankin") neighbor filed a complaint against him alleging that, among other things, Mankin was harassing him. (Ex 13, Mankin Discipline). The neighbor reported Mankin came to his house in full uniform to discuss their personal disputes. The neighbor reported that Mankin showed him marijuana he had seized during a case and intentionally did not submit to evidence. Mankin admitted to using his official police powers to resolve a personal grievance with his neighbor, and that he provided details of arrests and traffic stops to his neighbor that he made while employed with BCSO.  Id. at 6. During his IA, Mankin was not required to take a polygraph examination.*

### OFFICER PATRICK O'NEAL

*Corporal Patrick O'Neal ("O'Neal") was the subject of an IA investigation by Lt Baird. O'Neal was accused of engaging in adulterous relations with several different women while he was on duty. (Ex 14, O'Neal IA) O'Neal admitted to having sex while on duty, but claims that it only happened once. Id. He was also accused of posing naked only wearing his duty belt and his issued service weapon in his hand. This was a violation of BCSO's policy. Id O'Neal admitted that this did occur. Finally, O'Neal was accused of serving as a courtesy officer at an apartment complex to obtain free rent, a violation of BCSO's policy. O'Neal received a reduction in rank, pay, three-day suspension, a year probation, and a transfer to patrol as punishment. Id. During his IA, O'Neal was not required to take a polygraph examination.*

### SERGEANT ISSAC FRIPP

*On March 27, 2018, Staff Sergeant Issac Fripp[5] ("Fripp") was stopped for speeding by Corporal Boone ("Boone"). (Ex 15, Fripp IA) Boone did not smell the odor of alcohol from Fripp, but he*

---

[5] Mr. Fripp is a black male.

*did notice that Fripp's speech was slurred, and his eyes were glassy. Boone contacted his supervisors, regarding the traffic stop. Id. During the stop, Fripp's daughter and wife arrived at the scene. Id His wife asked if she could speak with her husband because he was not in a state in which he could operate his motor vehicle safely. Id Boone was advised by his supervisors to terminate the traffic stop. Fripp admitted to operating his vehicle while under the influence of alcohol. Id. It was recommended that Fripp receive counseling regarding his personal affairs as well as his consumption of alcohol while in an off-duty status and reduction in rank and reassignment. Id.*

### OFFICER KENNETH WAUTERS

*In 2019 Kenneth Wauters was under IA investigation for stealing money during a traffic stop. (Ex.16, IA Wauters). He was subject to a polygraph examination. During the examination, he was continuously moving his fingers which affected that cardiograph tracing, thus the test results were inconclusive. However, he was permitted to retake the exam five days later with the same questions. Id. at 1. The stated rationale for allowing him to retake the polygraph was that "examinee stated he is recovering from the flu." Id.*

### OFFICER JOSEPH MICHAUD

*Joseph Michaud was investigated on suspicion of defrauding BCSO by retaining money for himself that he represented was being used for a confidential informant. Mr. Michaud resigned before he could be terminated. Sheriff Tanner testified he would have been terminated had he not resigned. Despite this, Mr. Michaud's dishonest misconduct was not reported to the SCCJA. (Ex 2, Tanner Depo p. 191-192)(Ex 17, Michaud PCS) Additionally Michaud, like Ms. Nelson was hired by Bluffton, however unlike Ms. Nelson he is still employed and there is no indication Lt. Baird encourage Officer Joseph Babkiewicz to review Michaud's Beaufort files like he did with Ms. Nelson. During his IA, Michaud, was not required to take a polygraph examination.*

### OFFICER JOHNATHON BATES

*Johnathon Bates was involved in an incident with an individual who was being booked at the Detention Center. (Ex 18, Bates  IA) It was determined that Mr. Bates used excessive force by aggressively shoving the handcuffed individual in the neck area to the floor. Id. Mr. Bates' consequence was to receive additional use of force training and to have his promotion to Corporal suspended pending successful completion of six months' probation. Id  Bates resigned rather than accept his punishment and now currently works for Bluffton. Id  Sheriff Tanner reported to SCCJA on his PCS it was a routine separation. Id*

### OFFICER CHRISTOPHER CAPPS

*Christopher Capps received counseling for trapping and releasing cats in his neighborhood to Lemon Island. He was only given a written reprimand. (Ex 19, Capps Discipline)*

### DEPUTY CHIEF MIKE HATFIELD

*Deputy Chief Mike Hatfield was reprimanded for his firearm being stolen from his vehicle and failed to report it missing. The only punishment he received was having to pay for the cost of the firearm. (Ex 2, Depo Tanner p. 191-192)*

## LEGAL STANDARD

When considering Motion for Summary Judgment the court applies Rule 56(c), Federal Rules of Civil Procedure. Summary Judgment is proper when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). When factual matters are in dispute, all ambiguities, conclusions, and inferences arriving in and from the evidence must be viewed in the light most favorable to the non-moving party. See, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). When there is a mixed question of law and fact, such must be resolved by the finder of fact, as summary judgment is only proper while there is no issue of fact involved and inquiry into the facts is not needed to clarify application of the law. *McKinney v. Board of Trustees*, 955 F.2d 924 (4th Cir. 1992). When dealing with fact intensive cases, the Court has recognized that these cases are difficult to dispose of on summary judgment because all the evidence must be viewed in the light most favorable to the non-moving party, *Perini Corp. v. Perini Constr., Inc*., 915 F.2d 121, 123-23 (4th Cir.1990), *Cassity v. Geren*, 749 F. Supp. 2d 380 (DSC 2010). In order to defeat a motion for summary judgment, all that is required is that the non-moving party present "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249.

## ARGUMENT

I. **Plaintiff has established her discrimination claim through evidence of discriminatory animus <u>and</u> the burden-shifting framework of *McDonnell Douglas Corp.***

A plaintiff may survive summary judgment by establishing her discrimination claim either through direct and indirect evidence of discriminatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Under either avenue of proof, the focus is "on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision." *Sawicki v. Morgan State Univ.*, No. WMN-03-1600, 2005 U.S. Dist. LEXIS 41174, 2005 WL 5351448, at 6 (D. Md. Aug. 2, 2005). As is set forth below, Plaintiff has established her cause of action for discrimination under both frameworks.

### A. Ms. Nelson has demonstrated discrimination under Title VII and § 1981 pursuant to the burden-shifting framework of *McDonnell Douglas Corp. v. Green.*

Ms. Nelson alleges causes of action for discrimination based upon her race, and sexual orientation pursuant to Title VII. Additionally, Ms. Nelson has alleged discrimination based upon her race pursuant § 1981. The analysis for both discrimination claims is similar. In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (*en banc*). The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996). The second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas.*

To prevail on her discrimination claims, Ms. Nelson must satisfy the three-step proof scheme established in *McDonnell Douglas*. The first step requires plaintiff to prove by the preponderance of the evidence a *prima facie* case of discrimination. *Texas Dep't of Cmty. Affairs*

*v. Burdine,* 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The plaintiff's burden in presenting evidence to support a *prima facie* case of discrimination is "de minimis." *See. e.g. Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). If Plaintiff succeeds in proving a *prima facie* case, the burden shifts to the Defendants to articulate some legitimate, nondiscriminatory reason for their decision. *Id*. at 253. If the Defendants carry this burden, then the third step requires Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the Defendants were not the true reasons but were a pretext for discrimination. *Id*. A *prima facie* case may also be used to determine whether the employer's reason is pretextual. *Lewis v. AT&T Technologies, Inc*., 691 F. Supp. 915 (DC. Md., 1988). Further, a Title VII plaintiff may raise questions of fact as to whether the employer's proffered reasons for terminating her are pretextual, thus precluding summary judgment, either directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. *Murray vs. U. S. Dept. of Justice*, 821 F. Supp. (E.D. N. Y. 1993), *affirmed* 14 F. 3d 591 (1993).

### 1. Ms. Nelson has established a *prima facie* case of discrimination pursuant to Title VII and 42 U.S.C. § 1981.

The elements for a *prima facie* claim of discrimination under 42 U.S.C. § 1981 are the same as the elements for a claim of discrimination under Title VII. *Gairola v. Virginia Dep't of General Services*, 753 F.2d 1281, 1285 (4th Cir. 1985). To state a *prima facie* case of discrimination under Title VII and § 1981, the plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) [an] adverse employment action; and (4) that the adverse employment action taken was taken under circumstances giving rise to an inference of unlawful discrimination." *See White v. BFI Waste Servs*., LLC, 375 F.3d 288, 295 (4th Cir. 2004). The United States Supreme Court has emphasized that "[t]he burden of establishing a *prima facie*

case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-254 (1981). All that is required is an inference of unlawful discrimination. *Id.*

Ms. Nelson can easily establish the elements necessary to make out a *prima facie* claim of discrimination based on her race and sexual orientation. First she is a member of a protected class in that she is Black lesbian. Second, Ms. Nelson performed at a consistently high level, as reflected on her performance evaluations which show she received overall ratings of "exceeds expectations" and "meets expectations" throughout her employment. (Ex 21, Evaluations and Emails) Just a few months before her termination, Sheriff Tanner received an email from members of the community commending Ms. Nelson on how she handled a situation and describing her as an "outstanding leader." *Id* In fact, Ms. Nelson's personnel file contains several similar letters. *Id.* A showing of satisfactory performance does not require the plaintiff to show that she was a perfect or model employee. Rather, a plaintiff must show only that she was qualified for the job and that she was meeting her employer's legitimate expectations. W*arch v. Ohio Cas. Ins*. Co., 435 F.3d 510, 515-16 (4th Cir. 2006). Ms. Nelson has more than met the necessary showing. She has demonstrated that she was performing her job duties at a level that met her employer's legitimate expectations at the time of her termination. As to the third element, there is no dispute that Ms. Nelson's termination constitutes an adverse employment action. An adverse employment action under Title VII requires "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).

A plaintiff may establish the final element by showing that similarly-situated employees outside of her protected class were treated more favorably under similar circumstances. *Pettis v. Nottoway Cty. Sch. Bd*., 980 F. Supp. 2d 717, 725 (E.D. Va. 2013) (*citing Coleman v. Md. Court*

*of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)). In the employee discipline context, a *prima facie* case of discrimination is established if the plaintiff shows that she "engaged in prohibited conduct similar to that of a person of another race . . . and . . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985) (adapting *McDonnell Douglas* framework to employee discipline context). The Fourth Circuit has held that, to establish a comparator, a plaintiff must show that [she is] similar in all relevant respects to [her] comparator. *Kelley v. UPS*, 528 F. App'x 285, 286 (4th Cir. 2013). See *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Such a showing would include evidence that the employees dealt with the same supervisor, were subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id*. In the employee discipline context, a *prima facie* case of discrimination is established if the plaintiff shows that she "engaged in prohibited conduct similar to that of a person of another race . . . and . . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985).

In this case, Ms. Nelson was treated far more harshly in comparison to similarly situated employees from non-protected classes. She can demonstrate through multiple comparators that the disciplinary action taken against her was far more severe than the actions the Defendants took against other employees outside of her protected class. All of Plaintiff's comparators were subject to the same supervisor, in that they worked at the pleasure of Sheriff Tanner. (Ex 2, Depo Tanner 44:21-25). Also Plaintiff and her comparators were also subject to the same investigators. Lt. Baird has been handling the Defendants IA investigations since approximately 2010 (Ex 2, Depo Tanner

71:1-3). Defendants' use and interpretation of the polygraphs on officers during IA investigations was discriminatory. Defendants admitted the use of a polygraph in the course of an IA investigation is uncommon and that use of the polygraph is reserved for he-said, she-said situations where the truth is unclear to the investigator. (Ex 1, Depo Averill, 60:20-25, 61:1-7). However, the polygraph was rarely used against white male officers even when there were significant differences between the narrative of an officer and a complainant. When white male heterosexual officers were given a polygraph examination, errors in calculating the outcome frequently provided those officers with a determination of honesty, when an analysis of those results proved to be either inconclusive or indicate deception. (Ex. 8, Plaintiff's Expert Report,).

Defendants' discriminatorily apply a zero-tolerance policy for lying. It is the Defendants' claim that Ms. Nelson was terminated for lying during her IA investigation. (Ex Depo Tanner p.17 ln 1-4). This "zero-tolerance policy for lying" was discriminatorily applied, allowing white male officers to lie during IA investigations without termination. Defendants' were discriminatory in determining what conduct should result in termination of officers. White male officers who committed very serious misconduct—sometimes repeated instances of serious misconduct—were not terminated while Ms. Nelson was terminated over whether she used the word "ass" off-duty and in uniform.

### 2. Defendants' reason for terminating Ms. Nelson and for reporting to the Training Counsel that she engaged in misconduct is neither legitimate, non-discriminatory, or non-retaliatory.

Plaintiff establishes a *prima facie* case, the burden shifts to the Defendants to produce a legitimate, non-discriminatory or non-retaliatory reason for the disparate treatment. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Once Defendants have met its burden of production by producing its legitimate, nondiscriminatory

reason, the sole remaining issue is "discrimination *vel non*." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (*citing Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendants is not its true reason, but was pretext for discrimination or retaliation. *Reeves*, 530 U.S. at 143. Defendants' claim that Ms. Nelson was terminated for dishonesty, pursuant to a "zero-tolerance policy for lying". (ECF 59-1, p. 8-9). This stated justification for terminating Ms. Nelson is severely undermined by the inconsistent application of this policy to white heterosexual male officers.

### 3. Ms. Nelson has presented sufficient evidence for a reasonable jury to conclude that Defendants' supposedly legitimate reason is merely a pretext for illegal discrimination.

The Plaintiff has produced evidence that Defendants' proffered reason for terminating her were a pretext for discrimination. "[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 2019 WL 1768918, at 4 (4th Cir. 2019). If the plaintiff "offers such circumstantial evidence, the case must be decided by a trier of fact, because once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves at* 133. Here, ample evidence exists from which a factfinder could conclude that Defendants' asserted justification for terminating Ms. Nelson is pretextual.

In *Reeves*, the Court stated that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of circumstantial evidence that is probative of

intentional discrimination." *Id*. In this case, Defendants' explanation for terminating Ms. Nelson is false and unworthy of credence, as demonstrated by Defendants' biased and half hazarded investigation, Defendants' discriminatory application of a zero-tolerance policy for lying during the course of an IA investigation, Defendants' discriminatory use and interpretation of polygraph examinations, and Defendants' wildly unbalanced and discriminatory decisions regarding what conduct justifies termination.

### a. Zero-tolerance policy

It is the Defendants' claim that Ms. Nelson was terminated for dishonesty. (Ex 2, Depo Tanner 17:1-4). Defendants state that "[t]he Sheriff testified that without exception if it is determined that his employee lies at any time, for any reason, their career is over" and that "it is the policy of the Sheriff's office that if you lie in an investigation you lose your certification as a law enforcement officer." (ECF 59-1, p.8-9). However this zero-tolerance policy for lying was far from uniformly applied and Ms. Nelson's white male comparators who violated this "policy" were not terminated.

As set forth above, in 2012 Prusinowski, a white heterosexual male, was accused of domestic assault as well as a "blatant attempt to mislead his supervisor". (Prusinowski Disciplinary Record, Ex. 12). Instead of being terminated for his blatant attempt to mislead his supervisor, in violation of the supposed zero-tolerance policy for lying, Prusinowski was allowed to maintain his position and was only put on 6-month probation. *Id*.

Prusinowski then gets arrested in 2018 for hitting his wife. Prusinowski is given a polygraph and asked whether he hit his wife. According to Defendants, Prusinowski's test results indicated, No Deception. Yet, Plaintiff's expert determines that Lt. Baird and Capt. Averill incorrectly scored his test and the correct result was "Deception Indicated." (Ex. 8) In fact,

Defendant's own expert determined Prusinowski's test was Inconclusive. (Ex. 22)  Even the Defendants agree that Prusinowski  did not get a passing score.  Therefore, Prusinowski violated the zero-tolerance policy for lying but was not terminated or reported to the Training Counsel.

### Use of polygraph examination.

Defendants admitted that the use of a polygraph in the course of an IA investigation is uncommon and that use of the polygraph is reserved for situations where there is inconsistency between the narrative of the officer and the individual making a complaint against the officer being investigated. (Ex Depo Averill, 60:20-25, 61:1-7). Despite this claim, the polygraph was rarely used against white heterosexual male officers when there were narrative discrepancies in instances where officers were accused of very serious misconduct.

Deputy Stuart Mankin was not subject to a polygraph in 2011 when he was investigated by IA for using his authority to resolve a personal dispute he was having with his neighbor. (Ex. 13, IA Mankin). Mankin's narrative provided to IA was inconsistent with his neighbor's complaint regarding serious violations of police policy and procedures. *Id*. at 6, 11-12. Although this situation presents the precise circumstance under which Capt. Averill testified a polygraph examination would be utilized, Mankin was not subject to polygraph examination, he was not terminated, and the only consequence for his conduct was counseling on the policies he had violated. *Id*. at 2-3.

Similarly, in 2013 Corporal O'Neal was the subject of an IA investigation for having sex with women while on duty. (Ex. 14, IA O'Neal). His wife filed a complaint against him alleging that he had sex with multiple women while on duty. *Id*. at 20. When questioned about this claim, O'Neal only admitted to having one sexual encounter with his wife's best friend while he was on duty, but denied that it had happened more than once. *Id*. at 9. Again, despite this inconsistency in the narrative of the officer accused of misconduct and the narrative of the complainant, O'Neal

was not subjected to a polygraph examination, was not terminated, and faced minimal disciplinary action. *Id*. at 1.

### b. Interpretation of polygraph results

In 2019, Kenneth Wauters was under IA investigation for stealing money during a traffic stop. (Ex.16, IA Wauters). He was subject to a polygraph examination, but was permitted to retake the exam five days later when the results came back inconclusive. *Id*. at 1. The stated rationale for allowing him to retake the polygraph was that "examinee stated he is recovering from the flu." *Id*. After being arrested in 2018 for domestic assault Deputy James Prusinowski was subject to an IA investigation and a polygraph examination. (Ex.12, IA Prusinowski,). Defendants' own polygraph expert found that the results of Prusinowski's polygraph were misinterpreted, granting Prusinowski a passing score when the Defendants' expert determined the results were more accurately classified as inconclusive. (Ex. 22, p. 13, Defs' Expert Report). In their report Defendants' polygraph expert concluded that:

> [A] decision of Inconclusive is warranted, and that the testing examiner's results of No Deception Indicated was not supported... The OSS-3 algorithm returned a result indicating deception. The Plaintiff SMEs' scores summed to a total that fell just at the threshold for a decision of deception. However, ...there was an additional scoring error by the testing examiner they failed to identify in their report. When corrected, their manual scores would produce an Inconclusive outcome. *Id*.

Additionally, the expert found that "[a] review of the video recording revealed incidental departures from the standard testing protocol." *Id*. Plaintiff's polygraph expert observed that the testing examiner reviewed only the comparison questions between the charts and not the relevant questions. (Ex. 8, Pltf's Expert Report). Plaintiff's Expert stated that this practice would have the effect of increasing the signal value of the comparison questions, thereby possibly causing polygraph test scores to be pushed in the direction of a passing score. *Id*. at 9.

Defendants' interpretation errors were not limited to Prusinowski's case, noted by both Plaintiff's and Defendants' polygraph experts. In reviewing Defendants' interpretation of Deputy Jason Wilson's polygraph, Defendants' expert stated that "[t]his reviewer concluded that a decision of No Deception Indicated was not supported in this case. The reviewer's scores produced a result of Inconclusive." (Defendants' Expert Report, Ex. 22, p. 10). Further, Plaintiff's polygraph expert, in reviewing 13 polygraph files, identified quality control as an issue impacting the accuracy of Defendants' polygraph results. (Plaintiff's Expert Report, Ex. 8, p. 4). In particular he noted that "Lt. Baird conducted the quality control review of Plaintiff's exam… However, Lt. Baird was the investigating officer handling Plaintiff's case. Therefore, he does not qualify as an unbiased, independent, and objector reviewer. *Id*.

### c.   Conduct justifying termination

White heterosexual, male officers that committed serious misconduct were not terminated. Prusinowski, who was investigated in 2012 for domestic violence, and was arrested in 2018 for another incident of domestic violence was not terminated. (Ex 12). Lt. Baird gave Prusinowski a passing score when Defendants' own expert reported the results were more accurately classified as inconclusive.(Defendants' Expert Report, Exhibit 22, pg. 13). In 2019 Prusinowski was arrested for DUI and Unlawful Conduct Towards a Child. (Ex. 2, Depo Tanner p.170-176). No disciplinary action was taken, he was not subjected to a polygraph, and Prusinowski was allowed to resign after his arrest and was later hired back. *Id*.

Corporal Jonathan Bates, a white male, used excessive force on a handcuffed suspect at the detention center. (Bates Disciplinary Record, Ex. 18). He was not subjected to a polygraph during the course of the IA investigation, was not terminated and was only required to receive remedial training on use of force. *Id*.

Deputy Capps, a white male, trapped his neighbor's cats and released them on Lemon Island. (Capps Disciplinary Record, Ex. 19). He was not subjected to a polygraph, not terminated, and was only given a written reprimand. *Id*.

Deputy Mankin, a white male, used his authority to resolve a personal dispute he was having with his neighbor. (Mankin IA Investigation, Ex. 13). He was not terminated and faced no disciplinary action other than review of the policies he had violated. *Id*.

Major Roper, a white male, failed to report his service weapon was stolen from his unmarked car. (Ex 2, Tanner Depo p 193). He was not terminated and the disciplinary action was limited to reimbursing the county for the cost of the weapon. *Id*.

Chief Hatfield, a white male, failed to report his service weapon stolen from his unmarked car. (Ex 2, Tanner Depo p 191-193) He was not terminated and faced no disciplinary action. *Id*.

The inconsistencies and dissembling demonstrated by Defendants' own documents render Defendants' stated reasons regarding the Ms. Nelson's termination unworthy of credence, which gives rise to an inference of discrimination and pretext. Plaintiff has adduced facts from which a jury of her peers could conclude that Defendants' proffered explanations regarding Ms. Nelson's termination is merely a pretext for discrimination.

## B. Discriminatory Animus

Ms. Nelson has also satisfied the requirements for Title VII under the mixed-motive framework. Pursuant to the Civil Rights Act of 1991, a plaintiff succeeds on a mixed-motive claim if she "demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e-2(m). The impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *Id*. However, if an

employer can demonstrate that it "would have taken the same action in the absence of the impermissible motivating factor," it can restrict a plaintiff's damages to injunctive and declaratory relief, and attorney's fees and costs. 42 U.S.C.A. § 2000e-5(g)(2)(B).

A plaintiff may survive summary judgment by establishing his discrimination claim either through direct and indirect evidence of discriminatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See *Diamond v. Colonial Life & Acc. Ins. Co*., 416 F.3d 310, 318 (4th Cir. 2005). Under either avenue of proof, the focus is "on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision." *Sawicki v. Morgan State Univ.*, No. WMN-03-1600, 2005 U.S. Dist. LEXIS 41174, 2005 WL 5351448, at *6 (D. Md. Aug. 2, 2005).

Because "a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a 'motivating factor in the employer's action,'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 421, 131 S. Ct. 1186, 1193 (2011). Therefore, if a biased supervisor tries to get an employee fired, and that employee is, in fact, fired as a result, then the fired employee can sue the employer for employment discrimination, even if the biased supervisor is not the final decision maker and even if the final decision maker is unbiased. *Id*. A complaining party may demonstrate that discrimination motivated an adverse employment action if (1) the individual with the discriminatory animus "possessed such authority as to be viewed as the one principally responsible for the [adverse employment] decision or the actual decision maker for the employer," under *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 304 (4th Cir. 2004)*;* or (2) the subordinate with discriminatory animus *intended* to influence the person with decision-making authority and was a

proximate cause of the ultimate adverse employment action, under *Staub. See id.; accord Ridgell v. Colvin,* Civ. No. DKC-10-3280, 2013 U.S. Dist. LEXIS 34126, 2013 WL 952253, 12 (D. Md. Mar. 11, 2013).

Lt. Baird has a documented history of racist, bigoted beliefs and was disciplined for posting these beliefs on Facebook. (Ex 6) The way in which he treated Ms. Nelson compared to the white heterosexual male officers that he investigated illustrates how his belief impacted the way he pursued IA investigations and the impact that these beliefs had on Ms. Nelson's termination. Lt Baird was the investigating officer in Ms. Nelson's case. He was responsible for determining how the IA investigation proceeded, whether Ms. Nelson was subject to a polygraph test, and the conclusions he reached in his investigation had a huge impact on Ms. Nelson's termination. Although he was not the final decision-maker, he was certainly the proximate cause of her ultimate adverse employment action.

## II. Claim for Title VII Hostile Work Environment and Harassment

The standards for a hostile work environment claim are identical under Title VII and Section 1981. *See, e.g., Verdin v. Weeks Marine Inc*., 124 Fed. Appx. 92, 95 (3d Cir. 2005). The Fourth Circuit stated the test for a hostile work environment claim in *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998), *citing Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772(4th Cir. 1997). The Court held that to state a claim for hostile work environment, a plaintiff must show that: (1) the harassment was unwelcome; (2) the harassment was based on his race, sex, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) The Supreme Court recently held that, within the meaning of Title VII, the terms "because of 'sex'"

prohibit employment discrimination on the basis of an individual's sexual orientation. *Bostock v. Clayton County.,*140 S. Ct. 1731, 1754, (2020). Justice Gorsuch, writing for the majority The Supreme Court noted that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 1741.

Ms. Nelson easily satisfies the first two elements of this claim. First, she did not welcome the insults and derogatory comments directed at her. Second, the comments were explicitly based on her race, her sex, and her sexual orientation. She was perpetually referred to as a "female stud." (Ex 23, Depo Nelson p. 29) Other lesbian women were said to be "a disgrace" and to not be someone you'd want to back you up. (Ex 23, Depo Nelson p. 23, 29) Additionally, Ms. Nelson was continuously singled out as "the black female" and sent to "black neighborhoods." (Ex 23, Depo Nelson p. 32)

In regards to the third element, the harassment occurred continuously over the course of Ms. Nelson's employment and in aggregate created a hostile working environment. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet... by a supervisor in the presence of his subordinates." *See, Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993) (citation and internal quotation marks omitted). The Eighth Circuit Court of Appeals has recognized, for example, in *Carter v. Chrysler Corp.*, 173 F.3d 693 (8th Cir. 1999), that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII." *See, Carter*, 173 F.3d at 70. "Under the 'totality of circumstances' approach, a 'district court should not carve the work environment into a series of discrete incidents and then measure the harm according to each episode.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir.1999). As the Third Circuit has colorfully described it, "[a] play cannot be understood on the

basis of some of its scenes but only on its entire performance, and, similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990). Disaggregating claims undercuts the totality of circumstances inquiry, because it "robs the incidents of their cumulative effect, and '[o]f course, when the complaints are broken into their component parts, each claim is more easily dismissed.'" *Jackson*, 191 F.3d at 660. Additionally, In measuring the severity of harassing conduct, the status of the harasser may be a significant factor — e.g., "a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). Simply put, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

The conditions and culture at the Beaufort County Sheriff's Department punished minorities for making complaints and going outside the chain of command even when the harasser was that individual's supervisor. This impacted Ms. Nelson's ability to exercise her legal rights if she wanted to continue having a career. Ms. Nelson saw other gay women on the force "railroaded" for reporting derogatory comments. *Id*. at 30-31. She herself was dismissed when she attempted to confide in a superior about the harassment she was facing. *Id*. 32-33. Additionally, for over a year she was sexually harassed by a superior who responded to her complaints and refusal to engage in inappropriate discussions with him by writing her up for fictitious policy violations. *Id*. at 43. This cumulatively created a working environment that enabled abusive behavior and made it impossible for Ms. Nelson to report harassment without retribution.

In regards to the fourth element, liability on the employer is appropriate because harassment was often committed by individuals with supervisory authority over Ms. Nelson and

because her attempt to report the harassment to someone with supervisory authority was dismissed. The status of the harasser is relevant to element four of a hostile work environment claim. On the one hand, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439, 186 L. Ed. 2d 565 (2013); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc) ("[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it."). On the other hand, where the harasser is the victim's supervisor, "different rules apply": The employer is strictly liable for the supervisor's harassing behavior if it "culminates in a tangible employment action," but otherwise "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Vance, 133 S. Ct. at 2439 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765).

The harasser qualifies as a supervisor "if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 133 S. Ct. at 2439. An employee so empowered is able to "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id*. at 2443 (*quoting Ellerth*, 524 U.S. at 761). To be considered a supervisor, the employee need not have the final say as to the tangible employment action; instead, the employee's decision may be "subject to approval by higher management." *Vance*, 133 S. Ct. at 2446 n.8 (citing Ellerth, 524 U.S. at 762). The Vance Court determined that one of the harassers in *Faragher* "possessed the power to make employment decisions having direct

economic consequences for his victims" based on the following: "No one [had been] hired without his recommendation;" he "initiated firing and suspending personnel;" his performance evaluations "translated into salary increases;" and he "made recommendations regarding promotions." *Id*. (internal quotation marks omitted). Additionally, the Court observed that, "even if an employer concentrates all decision-making authority in a few individuals, it likely will not isolate itself from heightened liability under *Faragher* and *Ellerth*," in that those individuals likely will have to rely on the recommendations of others, and "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id*. at 2452 (citing *Ellerth*, 524 U.S. at 762).

In the present case Ms. Nelson faced discriminatory conduct from co-workers and supervisors alike. Not only did the culture and structure of the department have a chilling effect on reporting discrimination in general, but one of Ms. Nelson's harassers was a supervisor that punished her via write ups for refusing his inappropriate advances. Additionally, Ms. Nelson's attempt to report her harassment was dismissed by another superior. The department failed to provide avenues for reporting of discrimination, a particularly crucial need in a workplace that operates under a strict command hierarchy, and should be held liable for the hostile work environment that they fostered.

### 4. Ms. Nelson has established her § 1983 claim against Sheriff Tanner and Lt. Baird in their official capacities and is entitled to injunctive relief.

Defendants violated Ms. Nelson's constitutional rights under the Equal Protection and Due Process Clauses when they, as a result of Plaintiff's gender and gender expression, intentionally targeted Ms. Nelson for differential treatment and adverse employment actions. Under § 1983 a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. See, e.g., *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721, 204 L. Ed. 2d 1 (2019); *Filarsky v. Delia*, 566 U.S. 377, 132 S. Ct. 1657, 182 L. Ed. 2d 662 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)); see *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); see *Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), cert. denied, 565 U.S. 823, 132 S. Ct. 112, 181 L. Ed. 2d 37 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). The phrase 'under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); see also *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)).

Ms. Nelson easily satisfies the first element. Ms. Nelson states a claim pursuant to the Equal Protection Clause of the United States Constitution. As to the second element, the termination of Ms. Nelson by the Beaufort County Sheriff's Department is undeniably an action taken under the color of state law. To state a claim for an Equal Protection violation, Ms. Nelson must allege facts that show that she was (1) "was treated differently from others who were similarly situated;" (2) that differential treatment was the "result of discriminatory animus;" and, (3) the disparity in treatment cannot be justified under intermediate scrutiny. *Garraghty*, 239 F.3d at 654; *Equity in Ath., Inc.*, 639 F.3d at 108. These elements are satisfied by Ms. Nelson's Title VII showing and Plaintiff will not waste the Court's time restating those points.

Defendants claim qualified immunity protects them from liability under § 1983. (ECF 59 at 13). Government officials 'performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (citing *Harlow v. Fitzgerald* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); see also *Todd v. Smith* 305 S.C. 227, 238, 407 S.E.2d 644, 650 (1991) (quoting *Harlow*). '[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level....'" *Saucier v. Katz* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202, 121 S.Ct. 2151 (citing *Wilson* 526 U.S. at 615, 119 S.Ct. 1692). The first two of these present pure questions of law for the courts. *Harlow*, 457 U.S. at 818,

102 S.Ct. at 2738. The third, which involves application of *Harlow*'s objective test to the particular conduct at issue, may require factual determinations respecting disputed aspects of that conduct. *Anderson v. Creighton* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987). *Pritchett v. Alford* 973 F.2d 307, 312 (4th Cir.1992). *Esau Heyward v. Samuel Christmas* 352 S.C. 298, 309-310 573 S.E.2d 845.

The overall purpose of qualified immunity is to ensure that government officials "reasonably can anticipate when their conduct may give rise to liability by attaching liability only if 'the contours of the right [violated are] sufficiently clear that a reasonable official would understand that what his doing violates that right[.]'" *Solis v. Prince George's County*, 153 F.Supp. 793, 800 (D.Md. 2001)), quoting *United States v. Lanier*, 520 U.S. 259, 270(1997))The Defendants are not Entitled to Eleventh Amendment immunity and named Defendants are persons within the meaning of 1983. It is clear that each and every defendant knew that their actions would violate the Plaintiff's rights. These rights are foundational to the United States Constitution and to the laws that Defendants enforce on a daily basis for their profession. A reasonable officer faced with the same situation would have known that his actions violated Ms. Nelson's constitutional rights.

If the Court determines that Plaintiff cannot recover damages under § 1983, Plaintiff should still be allowed injunctive relief in the form of reinstatement to her position with Beaufort County Sheriff's Department. The Eleventh Amendment's expansive reach, however, is not without limits. The Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Lee-Thomas v. Prince George's Cty. Pub. Schs.*, 666 F.3d 244, 249 (4th Cir. 2012) (internal citations omitted)Further, "[i]n a § 1983 suit or a Bivens action— where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is

only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. See also *Iqbal*, 556 U.S. at 693, (Souter, J., dissenting) (stating that "[l]est there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating Bivens supervisory liability entirely.")

### 6.    State Defamation Claim

The essential elements of a claim for defamation under South Carolina law are 1) a false and defamatory statement; 2) unprivileged publication to a third party by defendant; 3) fault on the part of the defendant publisher; and 4) actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Erickson v. Jones Street Publishers*, LLC, 368 S.C. 444, 455, 629 S.E.2d 653, 664 (2006). With respect to the fourth element, defamation that is actionable irrespective of special harm is defamation per se, which includes defamatory statements regarding 1) the commission of a crime, 2) contraction of a loathsome disease, 3) adultery, 4) unchastity, or 5) unfitness in one's business or profession. *Fountain v. First Reliance Bank*, 398 S.C. 434, 442, 730 S.E.2d 305, 309 (S.C.2012) (citing *Goodwin v. Kennedy*, 347 S.C. 30, 36, 552 S.E.2d 319, 322-23 (S.C.Ct.App.2001)). Defamatory communications can be accomplished by actions or conduct in addition to spoken words. *Erickson v. Jones Street Publishers*, LLC, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006).

Defendants argue that they are not liable for the defamation communication because a qualified privilege applied to their communications. However, "for a communication to be privileged, the person making it must be careful to go no further than his interests or his duties require." *Conwell v. Spur Oil Co.*, 240 S.C. 170, 178-79, 125 S.E.2d 270, 275 (1962) Additionally, for a qualified privilege to apply, the statements must have been made in good faith. When the communications were not made in good faith, courts in this district have held that the privilege

does not apply. *See. Lewis v. Richland Cty. Rec. Comm'n*, 2018 U.S. Dist. LEXIS 150937 (D.S.C., July 30, 2018) In *Lewis* both the magistrate and the district court found an issue of fact existed as to Plaintiff's defamation claim. Id. Moreover, the district court in *Lewis* did not allow the Defendants to use The South Carolina Torts Claim Act (SCTCA) as a shield. The court held the SCTCA "Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70(b).

There is ample evidence based on the facts of this case to find that the Defendants were not acting in good faith and their actions went further than their interests or his duties required.

## CONCLUSION

Plaintiff has shown there is a genuine issue of material fact; therefore, the Court should deny Defendants' motion and allow this issue to go to the jury.

Respectfully submitted,

s/ Marybeth Mullaney
Marybeth Mullaney (Fed. ID No. 11162)
652 Rutledge Ave Suite A
Charleston, South Carolina 29403
Phone (843) 588-5587
marybeth@mullaneylaw.net

/s/ Cameron Jane Blazer
Cameron Jane Blazer, Esq. FID 10131
1037-D Chuck Dawley Blvd Suite 100
Mount Pleasant, SC 29464
(843) 732-4441
cameron@blazerlaw.com

*ATTORNEYS FOR PLAINTIFF*

April 19, 2021
Charleston, SC