UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Selena Nelson, | ) | C.A. No. 9:18-cv-2962-DCN-MHC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Beaufort County Sheriff's Office, | ) | |
| Lieutenant Brian Baird, and Sheriff P.J. | ) | |
| Tanner, individually and in their official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff brings this action against her former employer Beaufort County Sheriff's Office ("BCSO") and individual Defendants Lieutenant Brian Baird and Sheriff P.J. Tanner, alleging claims of employment discrimination, constitutional violations, and defamation. ECF No. 52.

Before the Court is Defendants' Motion for Summary Judgment, ECF No. 59 ("Motion"), filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff filed a Response, ECF No. 66, and Defendants filed a Reply, ECF No. 70. The Motion is ripe for review.

All pretrial proceedings in this case were referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. This Report and Recommendation is entered for review by the District Judge. For the reasons set forth below, the undersigned recommends that the Motion be granted.

## BACKGROUND

Plaintiff is a black lesbian woman who was employed by BCSO for over thirteen years before her termination following an investigation into a citizen's complaint. On July 31, 2017,

1

Tyler Weaver, a service tech at a vacuum store in Bluffton, South Carolina, submitted an electronic citizen's complaint to BCSO alleging unprofessional conduct by Plaintiff. ECF 59-8 at 35–38. The citizen's complaint alleged that Plaintiff was off duty and in uniform when she entered the store seeking a refund on an air purifier. *Id.* Weaver asserted that Plaintiff "bullied and intimidated" him by raising her voice and requiring him to refund her in "CASH MONEY" for a defective product. *Id.* He further claimed she "behaved thuggish" and used "vulgar language," specifically the words "ass," "screwed," and "crap." *Id.* The complaint stated, "She had her service glock and taser on her person, she demanded cash, and frankly it felt like a police shakedown or robbery. . . . At best this is abuse of power[;] at worst it is extortion and threatening." *Id.*

The next day, Defendant Lt. Brian Baird sent an e-mail to Weaver confirming receipt of the complaint. ECF No. 59-8 at 39. Lt. Baird worked in BCSO's Internal Affairs ("IA") division, also known as the Office of Professional Responsibility ("OPR"), along with Captain Matthew Averill. ECF No. 66-1 at 4; ECF No. 66-2 at 2–3. Capt. Averill had been handling polygraphs and IA investigations since 2000, and Lt. Baird had been handling IA matters and performing polygraphs since 2010. *Id.*

Between August 1, 2017, and August 10, 2017, Lt. Baird investigated Weaver's complaint, prepared a report, and submitted his findings to Chief Deputy Michael M. Hatfield. ECF No. 59-8 at 18, 22–76. During the course of his investigation, Lt. Baird interviewed Weaver twice and Plaintiff twice. ECF No. 59-8 at 25, 30. Lt. Baird also interviewed the owner of the vacuum store, Bradley Blake. *Id.* at 25. Blake said that Weaver had called him while Plaintiff was in the store and that he could hear a woman yelling she wanted a cash refund. *Id.* He said he advised Weaver to call the police because of the way the woman was yelling, but he was shocked to learn from Weaver that the woman was a police officer. *Id.* at 25–26.

Lt. Baird also interviewed store manager Lindsey Vargas. ECF No. 66-5. Vargas stated that Plaintiff called her on her cell phone while Weaver was on the phone with the store owners. *Id.* at 51:14–19. Vargas said that she gave her personal cell number to any customer who purchased a large amount of products, as Plaintiff had done. *Id.* at 51:1–7. Vargas told Lt. Baird that she sold Plaintiff the air purifiers and found Plaintiff "quite professional." ECF No. 66-5 at 52:1–2. She said that she had "never had an interaction that was negative with [Plaintiff]." *Id.* at 52:2–4. When Plaintiff called her cell phone from the store, Vargas was "off the clock" and in a restaurant with noise, but she "never heard any tone or [Plaintiff] raising her voice or saying anything negative." *Id.* at 51:19–22. Lt. Baird asked Vargas, "While she was on the phone with you, did you ever hear her saying, like, to the effect of, I want cash, give me my cash, things like that?" Vargas responded, "I heard her say, debit it out of my account the same day, same as cash. But that was all. Because, like I said, I was at a restaurant, so there was noise going on." *Id.* at 52:5–24. Lt. Baird also asked Vargas, "Do you remember her making a comment to you, something to the effect of the-- the reason she bought the two air purifiers is something like you sold your ass off or something like that." *Id.* at 52:25–53:4. Vargas responded, "No." *Id.*

Lt. Baird prefers to speak with witnesses "in person so [he] can observe them" to "see their reactions," as this can be helpful to determine their truthfulness, credibility, and any bias they might have. ECF No. 66-3 at 2. However, he never met in person with Weaver or any of the other witnesses—except for Plaintiff. *Id.* at 3. While Lt. Baird's first interview of Plaintiff lasted approximately three hours, Lt. Baird spent a combined total of twenty-five minutes interviewing all of the other witnesses. *Id.*

On August 8, 2017, the date of Plaintiff's first interview by Lt. Baird, Plaintiff was informed, in writing, that she was the subject of a complaint. ECF No. 59-8 at 27–30, 45. She

signed a statement acknowledging that BCSO can use statements she makes during the investigation against her for administrative purposes. *Id.* at 45. Plaintiff recounted her side of the story and denied that she yelled or used the word "ass." ECF No. 69-7 at 66:10–13, 68:20–22, 75:9–12. Multiple times during that interview, Lt. Baird warned Plaintiff that lying during the investigation could result in the loss of her certification. *See, e.g.*, *id.* at 66:10–20, 68:4–12. That same day, Plaintiff provided a written statement detailing her version of the events at the vacuum store. ECF No. 59-8 at 47–50. Among other details, she stated that she, "at no time in front of any customer[,] yelled at the clerk or called him an 'ass.' I did not use the word ass toward him or while anyone was inside the business." *Id.* at 49. After speaking to Plaintiff, Lt. Baird interviewed Weaver a second time and asked him about Plaintiff's use of the word "ass." Weaver told him that she used the word while speaking on the phone to manager Vargas, commenting that Vargas was "selling her ass off." *Id.* at 30.

On August 9, 2017, Lt. Baird met with Plaintiff before she was given a polygraph examination. *Id.* He asked her if there was anything she wanted to change or retract from her statement the day before. She responded that she was sure she never used the word "ass" towards anyone in the store. *Id.* When Lt. Baird told her that the salesclerk said she used the word while speaking to Vargas, Plaintiff denied that she used the word when she spoke to Vargas. *Id.*

Capt. Averill then administered a polygraph examination.[1] *Id.* Before starting the exam, Plaintiff was given a chance to review and revise her written statement from August 8, 2017. *Id.* at 31. She made a few changes, including the addition of the following statements, "While speaking with the manager [Vargas,] I did not say the word 'ass.'" *Id.* at 52–55 (further adding that she

---

[1] Defendants submitted as evidence a flash drive containing video of the polygraph examination. ECF No. 60.

never "stated the word 'ass'" and that she did "not recall saying the word 'ass'" while she was speaking to Vargas). During the polygraph examination, Capt. Averill twice asked Plaintiff if she lied in the statement that she wrote, and she responded "No" each time. *Id.* at 31. When Captain Averill scored the polygraph exam, he determined that deception was detected for both of these responses. *Id.* Lt. Baird also scored the exam and came to the same conclusion. ECF No. 59-8 at 57.

Following the polygraph examination, Lt. Baird interviewed Plaintiff again. ECF No. 59-8 at 31. He told her that the polygraph test indicated that she was not completely honest in her statement. *Id.* She told him that she felt it had to do with the yelling, though she said she never raised her voice to the highest level possible. *Id.* She again said she did not think she used the word "ass." *Id.* When Lt. Baird asked her whether she had used the word in a complimentary manner when she spoke to Vargas, Plaintiff laughed and said that she did say something to Vargas about "working her ass off." *Id.* She told Lt. Baird that she had not thought of that statement earlier. *Id.*

On August 10, 2017, Lt. Baird submitted his report to Deputy Chief Hatfield. In his report, he summarized most of his investigation; however, he did not include a summary of his interview with Vargas, in which she said she did not remember Plaintiff using the word "ass" or yelling during her phone call with Plaintiff. Lt. Baird later testified that his failure to mention Vargas in his report was due to "an oversight."[2] ECF No. 66-3 at 3. The report came to the following conclusions:

---

[2] Lt. Baird's report contains an e-mail dated July 31, 2017, and sent to Chief Deputy Hatfield from a person named Emma Lipinski. ECF No. 59-8 at 41. According to the e-mail, Lipinski was in the store at the time of the incident and heard Plaintiff use "profane words such as 'ass'" and raise her voice "yelling about a 'cash money' refund." *Id.* Lt. Baird reached out to her via e-mail on August 8, 2017, to schedule an interview. *Id.* at 43. She never responded, and Lt. Baird never verified the identity of the person who sent that e-mail. ECF 66-4 at 85. Although Lt. Baird omitted a summary

> This Administrative Inquiry determined Sgt. Selena Nelson acted in an unprofessional and inappropriate manner while wearing her BCSO uniform in the Oreck Home Center on July 31, 2017. She subsequently lied about her actions and language in the store. Sgt. Nelson was administered a polygraph examination and only after that did she admit she raised her voice and used the word ass in the store.
>
> The allegations against Sgt. Selena Nelson are Substantiated for violations of BCSO General Order 113 A 2, Section A, 1, e and f; 8; d; 9, a and f.[3]

ECF No. 59-8 at 33. Attached to the report were the original citizen's complaint, emails between Baird and witnesses, statements, audio or video recordings of the interviews and polygraph exam, and relevant BCSO standing orders.

On August 10, 2017, Major James W. Bukoffsky, a BCSO Division Commander, reviewed Lt. Baird's report and recommended that Plaintiff's employment be terminated. ECF No. 59-8 at 17. That same day, Deputy Chief of Staff Lieutenant Colonel Allen Horton, Chief of Staff D.A. Brown, and Chief Deputy Hatfield also reviewed the report and agreed that Plaintiff should be terminated. *Id.* They each noted their conclusions on a Disciplinary Action Form. *Id.* Chief Deputy Hatfield specifically noted, "The conclusion of the Office of Professional Responsibility (Internal Affairs) investigation confirms that Sgt. Nelson conducted herself in an unprofessional manner and further committed insubordination by giving deceptive answers to specific questions regarding her conduct. Immediate termination is warranted." *Id.* Chief Deputy Hatfield gave Plaintiff the

---

of his interview with Vargas, he did include a paragraph summarizing the e-mail from Lipinski. ECF No. 59-8 at 26–27. Plaintiff suggests in her Response that Lipinski is Weaver's mother, but the evidence she produces in this regard does not support her assertion. ECF No. 66 at 4; *see also* ECF No. 66-4 at 85:7–13 (Baird testifying that he does not know that Lipinski is Weaver's mother).

[3] These rules include not engaging in any conduct on or off duty that reflect discredit on the Sheriff's Office; cooperating fully in any internal investigation and providing complete and accurate information regarding any issue under investigation; being truthful and accepting responsibility for their action without attempting to conceal, divert, or diminish responsibility or impede, influence or interfere with an internal investigation; conducting oneself in a civil and professional manner that projects and supports public respect and cooperation; and not abusing authority granted by the Sheriff and the State of South Carolina.

Disciplinary Action Form indicating she was to be terminated, and she refused to comment or sign the form. *Id.* By letter dated August 10, 2017, Chief Deputy Hatfield formally notified Plaintiff of her immediate termination. *Id.* at 19.

Plaintiff's termination was reported on a Personnel Change in Status (PCS) Report to the Criminal Justice Academy denoting "misconduct" as the reason for termination. ECF No. 52 at ¶ 39. Pursuant to South Carolina law,

> The sheriff or the chief executive officer of a law enforcement agency or department within the State must report to the academy the occurrence of any . . . acts of misconduct by a law enforcement officer which could result in the withdrawal of the certification of the law enforcement officer who is currently or was last employed by his agency. The report shall be made within fifteen days of the final agency or department action resulting from the internal investigation conducted by the agency or department, and shall be on a form prescribed by the council.

S.C. Code Ann. § 23-23-150(B). As a result of the PCS report that she was terminated for "misconduct," Plaintiff's state law enforcement certificate was suspended. ECF No. 52 at ¶ 44. Nonetheless, the Bluffton Police Department hired Plaintiff within a month of her termination from BCSO. ECF No. 59-8 at 3.

Plaintiff attended a hearing before the South Carolina Law Enforcement Training Division in December 2017, regarding the BCSO's allegations of misconduct. Following the hearing, the Training Council issued a written opinion. ECF No. 66-3. In the Findings of Fact, the Hearing Officer noted that during her first interview, Plaintiff repeatedly denied that she called Weaver an ass or used the word ass while in the store. *Id.* at 8 ¶ 5. The Hearing Officer further noted that once Lt Baird told her, during the second interview, the specifics of the allegation—that Plaintiff had told Vargas that she sold her ass off—Plaintiff stated, after an audible laugh, "Well, um, yeah, I - I told her how great she was and like I said probably did say to her 'ass' but nothing derogatory for him. But I did tell her she sold her ass off." *Id.* at ¶¶ 6–7. The opinion noted Plaintiff's

explanation that she was "just too focused on [Mr. Weaver] because of the situation, not on [Ms. Vargas] because this was never an issue with [Ms. Vargas]" *Id.* at ¶ 8. The Hearing Officer explained that "although this is an exceptionally close case, it is unclear whether [Plaintiff] was dishonest or whether she was focused on what she said to the clerk and not to [Vargas]." *Id.* at 8–9 ¶ 10. Thus, the Hearing Officer found that "it was not proven by the substantial evidence in the record that [Plaintiff] engaged in misconduct." *Id.* at 9 ¶ 11. Accordingly, the Hearing Officer recommended that the Law Enforcement Training Council issue Plaintiff a S.C. law enforcement certification. *Id.* at 9. The Hearing Officer further recommended, "because this case is so close," that Plaintiff be placed on probation for two years during which time she was to complete eight hours of ethics classes each year. *Id.* Failure to complete the probationary period would result in the permanent revocation of Plaintiff's law enforcement certification. *Id.* The Law Enforcement Training Council accepted these recommendations. ECF No. 59-8 at 12.

## LEGAL STANDARD

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *See id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*

*v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). When a party fails to establish the existence of an element essential to that party's case, there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991) ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate.").

## DISCUSSION

In her Amended Complaint, Plaintiff alleges five causes of action. First, she asserts a claim against BCSO titled, "Title VII-Discrimination, Harassment, Hostile Work Environment, Retaliation." ECF No. 52 at 14. Second, she alleges a claim against all defendants for a violation of 42 U.S.C. § 1981. *Id.* at 14. Third, she alleges a claim, pursuant to 42 U.S.C. § 1983, against Defendants Baird and Tanner for violation of her Equal Protection rights under the Fourteenth Amendment. *Id.* at 18. Fourth, she alleges a § 1983 claim against Baird and Tanner for violation of her Due Process rights under the Fourteenth Amendment. *Id.* at 19. Fifth, and finally, she asserts a defamation claim against Baird and Tanner. *Id.* at 20. Defendants move, pursuant to Rule 56, for summary judgment on all of Plaintiff's claims. ECF No. 59.

## I.     Discrimination Under Title VII and 42 U.S.C. § 1981

In the First Cause of Action in the Amended Complaint, Plaintiff alleges a claim for race and sex discrimination, including sexual orientation discrimination,[4] under Title VII against

---

[4] As the Supreme Court recently held, discrimination based on sexual orientation or the failure to conform to traditional sex stereotypes violates Title VII "because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Bostock v. Clayton County*, — U.S. —, 140 S. Ct. 1731, 1742 (2020); *see Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 121 (4th Cir. 2021).

BCSO. In her Second Cause of Action, Plaintiff alleges a claim for race discrimination under 42 U.S.C. § 1981[5] against BCSO, Tanner, and Baird. Because Title VII and § 1981 claims are analyzed using the same framework, the undersigned addresses both claims together. *See Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (explaining that the *McDonnell Douglas* framework applies in employment discrimination and retaliation cases arising under Title VII or § 1981).

A plaintiff may avoid summary judgment on a discrimination claim through two avenues of proof: by relying on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or by "presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005); *see Guessous*, 828 F.3d at 216.

### A. *McDonell Douglas* Burden-Shifting Framework

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. 411 U.S. at 802. Once the plaintiff establishes her prima facie case, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). "Finally, if the employer carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the neutral

---

[5] Under 42 U.S.C. § 1981, each citizen is guaranteed the same right to "make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'"
*Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1983)).

### 1. Prima Facie Case of Discrimination

Generally, to establish a prima facie case of discrimination, Plaintiff must show the following elements: (1) membership in a protected class; (2) that she was performing her job satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination. *Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 719–20 (D.S.C. 2014); *see Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). In the context of employee discipline, the prima facie case is established by showing "(1) that plaintiff engaged in prohibited conduct similar to that of a person of another [protected class], and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 264–65 (4th Cir. 2008) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir. 1985)).

"[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator dealt with the same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019). Importantly, "the plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but similarly-situated in *all respects*." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (internal quotation marks omitted),

11

*as amended* (Mar. 26, 2019), *cert. denied*, 140 S. Ct. 381 (2019). "The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner*, 545 F.3d at 265 (citing *Moore*, 754 F.2d at 1106–10).

Plaintiff seeks to establish a prima facie case of race and sex discrimination by pointing to white male comparators whom she alleges were disciplined less harshly for more serious violations of BCSO's Rules. *See* ECF No. 66 at 17–18. She identifies the following comparators, *see id.* at 10–13:

- Corporal Bates, a white male, pushed a handcuffed suspect at the detention center to the floor. The evidence produced by Plaintiff indicates that on May 10, 2017, Bates was given a written reprimand for "Conduct Unbecoming (judgment)," was placed on a 6-month probationary period during which time his promotion eligibility was suspended, and was required to complete remedial training on use of force. ECF No. 69-5.

- Deputy Capps, a white male, received a written reprimand for a code of conduct violation involving animals on March 1, 2018.[6] ECF No. 69-6.

- Major Roper, a white male, had his service weapon stolen from his unmarked car. He was put on probation and had to reimburse the county for the cost of the weapon. ECF No. 66-2 at 190–91, 193.

- Deputy Chief Hatfield, a white male, also had his service weapon stolen from his unmarked car. He was put on probation and had to reimburse the county for the cost of the weapon. *Id.* at 191–93.

- Staff Sergeant Fripp, a black male,[7] was off duty when he was pulled over for speeding. The traffic officer suspected that Fripp was impaired while operating the motor vehicle, but he was not ticketed. Plaintiff produced evidence that on or about April 4, 2018, Fripp received a written reprimand for a Code of Conduct violation and was demoted to Sergeant with a one-year probationary period. ECF No. 69-2.

- Corporal O'Neal, a white male, was the subject of an IA investigation by Lt Baird after his wife filed a complaint that O'Neal was engaging in adulterous relations with several different women, that he had sex at least once while he was on duty, and that he had

---

[6] Plaintiff's Response suggests that the misconduct involved trapping cats and releasing them on an island; however, there is no evidence in the record to support this assertion.

[7] The Court interprets Plaintiff's inclusion of Sgt. Fripp as a proposed comparator for her sex discrimination claim. ECF No. 66 at 11.

engaged in other policy violations, including posing for a photo wearing only his duty belt with his service weapon in hand and living rent free in an apartment in exchange for being a Courtesy Officer. The evidence provided by Plaintiff indicates that O'Neal admitted to having sex one time while on duty and admitted to the other alleged policy violations. As discipline, he received a three-day suspension without pay and a reduction in rank, was placed on probationary status, and was transferred to patrol duty. ECF No. 69-1.

- Officer Wauters, a white male, was the subject of a citizen's complaint in which he was accused of harassment and stealing money during a traffic stop and search. Wauters denied the allegations and was administered two polygraph examinations. The first polygraph examination, administered by Captain Averill, was inconclusive, finding that "[n]o opinion as to the truthfulness of the subject could be rendered." ECF No. 69-3 at 4. The second polygraph examination, administered by John Adams five days later, resulted in a finding of "no deception indicated." *Id.* at 5. There is no evidence in the record addressing whether Wauters received any discipline.

- On May 3, 2012, Sgt. Prusinowski received a written reprimand for "Personal Conduct-Unbecoming" for "marital issues," was placed on probation for six months, and was required to seek marital counseling. ECF No. 66-11 at 1.

- In June 2018, Sgt. Prusinowski was investigated by IA following a domestic violence incident in which both Prusinowski and his wife were arrested by the Bluffton Police Department. Captain Averill conducted the IA investigation, which included a polygraph examination conducted by Lt. Baird that resulted in a finding of "No Deception Detected." Capt. Averill conducted a "Quality Control" check of the polygraph and came to the same conclusion. During the investigation, an assistant solicitor informed Captain Averill that the charges against both Prusinowski and his wife had been dismissed because the prosecutors were unable to determine who the primary aggressor was. As part of his investigation, Captain Averill reviewed the Bluffton Police report and multiple body-cam and dash-cam videos from the Bluffton Police Department taken during the arrest. In his report, he found that "it is clear [from the written incident report and the video evidence] the responding Bluffton officers determined Mrs. Prusinowski was the primary aggressor and th[at] Sgt. Prusinowski had acted in self-defense." Captain Averill ultimately recommended that the administrative investigation be closed as "Unfounded." ECF No. 66-11 at 3–8. Sgt. Prusinowski resigned from the BCSO on April 1, 2019. *Id.* at 9.

Unlike the conduct of the preceding proffered comparators,[8] Plaintiff's conduct did not

involve the use of physical force, animals, third-party theft of an officer's service weapon, a traffic

---

[8] Plaintiff also lists Deputy Mankin as a comparator, alleging that he used his authority to resolve a personal dispute he was having with his neighbor. ECF No. 66 at 11. However, there is no evidence in the record related to Deputy Mankin. She also lists Officer Michaud as a comparator, *id.* at 12, but the only evidence in the record related to him is the personnel form showing he resigned on March 2, 2015. ECF No. 69-4. There is no indication on that document that he engaged

stop, or domestic disputes. Plaintiff does not deny those differences. Rather, she argues that it is discriminatory that the comparators committed more serious rules violations but were not terminated, while she "was terminated over whether she used the word 'ass' off-duty and in uniform." ECF No. 66 at 18.

As an initial matter, Plaintiff does not point to any evidence in the record demonstrating that any one rule violation is more serious than another, and it is not the court's role to "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Moreover, the evidence in the record indicates that using the word "ass" while off-duty and in uniform was not the reason for Plaintiff's termination. Indeed, her termination letter, dated August 10, 2017, specifically stated that her termination was based, in part, on the fact that she was found to have lied during the investigation: "Your conduct, and the fact that you were found to have shown deception during a polygraph examination, is considered to be contrary to the good order and discipline of this Office and cannot be tolerated." ECF No. 59-8 at 19. Furthermore, there is evidence that BCSO considers lying to be a serious offense. Sheriff Tanner testified, "If you lie to a supervisor, if you lie in court, if you lie at any time, your job – your job in the sheriff's office is over, right then and there." ECF No. 59-14 at 223:10–12. Thus, to be similarly situated to Plaintiff for purposes of her prima facie case, a comparator must have been found to have shown deception on a polygraph examination or to have lied during an investigation but was not terminated.

---

in misconduct, and the undersigned is aware of no other evidence in the record indicating what misconduct, if any, he was alleged to have committed. Accordingly, as to Mankin and Michaud, Plaintiff has not produced evidence demonstrating that they are proper comparators.

Undisputed record evidence shows that of the 219 IA investigations conducted since 2011, twenty-two polygraph examinations were performed on twenty-one deputies. ECF No. 70-1 at 1 ¶¶ 3–4. Thirteen deputies had polygraph results of deception not indicated or that were inconclusive. *Id.* at 2 ¶ 6. Eight deputies had polygraph results of deception detected. *Id.* at ¶¶ 7–8. One of those deputies resigned (Hispanic male), while the other seven were terminated (three white males, one black male, two white females, and Plaintiff). *Id.* at ¶ 8. Thus, based on the undisputed record evidence, there is no comparator who was found to have shown deception on a polygraph examination but was not terminated.

The evidence further shows that of the proffered comparators, only Officer Wauters and Sergeant Prusinowski were given polygraph examinations. Wauters took two polygraph examinations: Captain Averill administered Wauters' initial polygraph test, which was inconclusive, while John Adams administered a second polygraph, which resulted in a finding of "no deception indicated." ECF No. 69-3. There is no evidence suggesting that Wauters was ever found to be lying during an investigation or on a polygraph examination, nor is there any evidence regarding the IA investigation's conclusions and what discipline, if any, was given to Wauters. Thus, on the record presently before the Court, Plaintiff has not shown that Wauters "engaged in prohibited conduct similar to" Plaintiff but received less severe discipline. *See Lightner*, 545 F.3d at 264–65.

During Captain Averill's IA investigation following the 2018 arrest of Sgt. Prusinowski and his wife for domestic violence, Lt. Baird administered a polygraph examination to Sgt. Prusinowski, which resulted in a finding of "no deception detected." ECF No. 66-11. Plaintiff produced as evidence a report from her polygraph expert and a report from Defendants' polygraph expert, in which each expert determined that Lt. Baird made scoring errors when he scored

Prusinowski's polygraph examination. ECF Nos. 66-8 & 69-9. However, while Plaintiff's expert opined that a "finding of Deception Indicated" was supported, ECF No. 66-8 at 9, Defendants' expert opined "that a decision of Inconclusive is warranted," ECF No. 69-9 at 13 (noting an additional scoring error by Plaintiff's expert). Importantly, there is no evidence in the record to suggest that anyone at BCSO, including Lt. Baird or Captain Averill, was aware of these scoring errors in 2018 or at any time before the experts in this case issued their opinions. Indeed, the Quality Control review conducted by Captain Averill in 2018 similarly concluded, as Lt. Baird did, that a finding of "No Deception Indicated" was supported. ECF No. 66-11 at 6.

Not only was Sgt. Prusinowski not found to have lied during the polygraph examination, but he also was not given any discipline, as Captain Averill closed the investigation as "Unfounded" upon learning that the charges had been dropped against Sgt. Prusinowski and determining that he had acted in self-defense. Thus, while Plaintiff's IA investigation resulted in the conclusion that Plaintiff had violated BCSO rules, the 2018 investigation into Sgt. Prusinowski reached the opposite conclusion. On this record, the undersigned concludes that Plaintiff has not produced evidence demonstrating that Sgt. Prusinowski and Plaintiff "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes*, 922 F.3d at 223–24.

Plaintiff also argues that the 2012 discipline of Prusinowski shows that BCSO's "zero-tolerance policy for lying was far from uniformly applied" and that white male comparators who violated the policy were not terminated. ECF No. 66 at 20. As evidence, she points only to a statement made on the 2012 Disciplinary Action form by Deputy Chief of Staff Baxley, in which he recommends a reduction in rank and says, "A corporal is expected to be a veteran officer, trustworthy and capable of guiding/leading younger troops. Prusinowski's blatant attempt to

mislead his supervisor violates this." ECF No. 66-11 at 1. Neither of the two subsequent reviewers in the chain of command agreed with Baxley's remarks or recommendations, and they were not adopted by the BCSO. *Id.*; ECF No. 66-2 at 6–7. There is no other evidence in the record related to the 2012 incident, including any evidence regarding the conduct that Baxley considered an "attempt to mislead," whether Prusinowski was given a polygraph examination, or whether he was found to have lied during an IA investigation. On this record, Plaintiff has failed to demonstrate that Prusinowski is a similarly situated comparator for purposes of her prima facie case. *See Haynes*, 922 F.3d at 223–24; *Lightner*, 545 F.3d at 264–65.

Plaintiff further contends that Defendants' use of polygraph examinations during IA investigations was discriminatory:

> Defendants admitted the use of a polygraph in the course of an IA investigation is uncommon and that use of the polygraph is reserved for he-said, she-said situations where the truth is unclear to the investigator. . . . However, the polygraph was rarely used against white male officers even when there were significant differences between the narrative of an officer and a complainant.

ECF No. 66 at 18 (citing ECF No. 66-1 at 60:20–61:7). Specifically, she points to evidence of the IA investigation into the complaint made by Corporal O'Neal's wife. According to Plaintiff, O'Neal's narrative conflicted with his wife's allegations, such that he should have been subjected to a polygraph examination. *Id.* at 21–22. However, review of the cited evidence reveals no obvious conflict. The wife's complaint said she specifically knew of one time that he had sexual relations while on duty, ECF No. 69-1 at 20, and O'Neal admitted to that one occasion, *id.* at 9. The wife also alleged that he was having sexual relations with multiple women, *id.* at 20, and O'Neal again admitted the same, *id.* at 9. While Plaintiff repeatedly denied during the IA investigation that she yelled or used the word "ass," in direct contradiction of the specific factual allegations in the citizen's complaint, O'Neal admitted to the specific factual allegations in his

wife's complaint. On this record, the undersigned concludes that the fact that O'Neal was not subjected to a polygraph examination does not raise an inference of discrimination, as Plaintiff has not demonstrated that O'Neal's conduct during the IA investigation was similar to Plaintiff's.

For the foregoing reasons, the undersigned concludes that Plaintiff has not produced evidence that a similarly situated comparator had engaged in prohibited conduct similar to Plaintiff but received less severe discipline. *See Lightner*, 545 F.3d at 264–65. Accordingly, Plaintiff has not carried her burden of showing a question of material fact regarding her prima facie case of discrimination under either Title VII or § 1981.

### 2. Legitimate, Non-Discriminatory Reason and Evidence of Pretext

Even assuming, for purposes of this Motion, that Plaintiff could establish a prima facie case of race or sex discrimination, summary judgment would still be appropriate because Defendants have proffered a legitimate, nondiscriminatory reason for discharging Plaintiff, and Plaintiff has failed to submit evidence showing that the reason is merely pretext for discrimination. Here, Defendants state that Plaintiff "was terminated for insubordination for lying on the polygraph examination, consistent with the Sheriff's zero tolerance policy for lying." ECF No. 59-1 at 8.

Because Defendants have met their burden of production regarding Plaintiff's discharge, the burden shifts back to Plaintiff to demonstrate "that the legitimate reasons offered by the defendant[s] were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted). "The final pretext inquiry merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt*, 601 F.3d at 294 (internal quotation marks omitted).

18

To demonstrate pretext, Plaintiff must show that her employer's assessment of her conduct was dishonest or not the real reason for her termination, rather than merely dispute the merits of the termination decision. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). Such a showing is required because "in a wrongful discharge action it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Id.* (internal citations omitted). The job of the court is not to appraise the employer's appraisal; rather, its "sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.*

Here, Plaintiff fails to show that Defendants' rationale for termination—that she lied during the polygraph examination—is a pretext for race or sex discrimination. As stated above, there is evidence in the record that of the 219 IA investigations conducted since 2011, twenty-one involved polygraph examinations, and all eight of the deputies who had polygraph results of deception detected either resigned (one Hispanic male) or were terminated (three white males, one black male, two white females, and Plaintiff). ECF No. 70-1 at ¶¶ 3–8. Plaintiff does not rebut this evidence. Rather, she raises substantially the same arguments and points to the same evidence that she did in support of her prima facie case. However, she has not identified any BCSO employee who has been determined to have lied during an investigation that was not terminated as the result of that lie. Furthermore, she has not pointed to any evidence in the record showing that the "zero-tolerance policy for lying" was applied in a discriminatory manner on the basis of sexual orientation or race. Finally, she has not produced evidence showing that her employer's assessment of her conduct was dishonest.[9] Accordingly, the undersigned concludes that Plaintiff has failed to establish her claim of disparate treatment through the *McDonnel Douglas* framework.

---

[9] Both Plaintiff's expert and Defendants' expert found that Captain Averill made a scoring error in scoring Plaintiff's polygraph examination, but there is no evidence in the record that the result

## B. Mixed-Motive Framework

Alternatively, Plaintiff argues that she has established her claim through the mixed-motive framework. ECF No. 66 at 24–25. Under this framework, a plaintiff "can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race [or sex] motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (further explaining that "the impermissible factor need not have been the sole factor" and that "[a]s long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice").

Under the mixed-motive approach, a plaintiff is required to forecast direct or circumstantial evidence that race or sex motivated, at least in part, the adverse employment action. *See id.* To survive summary judgment on the basis of direct or circumstantial evidence, Plaintiff "must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace v. Costa*, 529 U.S. 90 (2003); *see also Stewart v. Gestamp S.C. LLC*, No. 7:17-CV-1023-TMC, 2018 WL 3454786, at *4 (D.S.C. July 18, 2018), *aff'd*, 754 F. App'x 202 (4th Cir. 2019). "Direct evidence is evidence that the employer announced, admitted, or otherwise indicated that the forbidden consideration was a determining factor" in the employer's challenged action. *Bickford v. Denmark Tech. Coll.*, 479 F. Supp. 2d 551, 564 (D.S.C. 2007) (internal quotation marks

---

of her polygraph examination should have been anything but "deception detected." While Plaintiff's expert did not opine as to whether a different result would have been supported absent the error, *see* ECF No. 66-8 at 8, Defendant's expert found that "this change had no effect on the reviewer's final decision of Deception Indicated," ECF No. 69-9 at 12.

omitted) (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)). Circumstantial evidence must be "of sufficient probative force to reflect a genuine issue of material fact" and "includes 'conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (quoting *Jacobs*, 780 F.3d at 577–78).

Plaintiff does not produce any direct evidence that race or sex was a determining factor in her termination. Rather, she relies on circumstantial evidence, arguing that "Lt. Baird has a documented history of racist, bigoted beliefs and . . . [t]he way in which he treated [Plaintiff] compared to the white heterosexual male officers that he investigated illustrates how his belief impacted the way he pursued IA investigations and the impact that those beliefs had on [Plaintiff's] termination." ECF No. 66 at 26. In support of these assertions, Plaintiff produced evidence that Lt. Baird, in or around June 2020—almost three years after Plaintiff's termination—made several public posts on Facebook regarding politics and racism.[10] ECF No. 66-7. Plaintiff does not cite any evidence supporting her assertion that Lt. Baird treated her differently than the white heterosexual male officers that he investigated or otherwise identify the investigations to which she refers. However, the undersigned infers that Plaintiff is referring only to Lt. Baird's investigation into Corporal O'Neal because the record contains evidence of only two IA

---

[10] One of his posts showed an image of Barack and Michelle Obama with Lt. Baird's message: "They sure did stoke the flames of racism and did their best to divide America and help his Muslim Brothers." ECF No. 66-7 at 7. Another post showed an image of Donald Trump with three black men and the words, "Wasn't a racist until . . . he ran for president as a Republican, AND WON!" *Id.* at 9. A third post contained a meme with an image of Al Sharpton and Jesse Jackson and the words, "Calling these two guys 'Reverend' is like calling dogsh*t tootsie rolls." *Id.* at 8. Lt. Baird's message accompanying the meme stated, "I wish Al would just pay his taxes or go to prison like all other criminals." *Id.* When asked about his Facebook posts at his deposition, Lt. Baird testified that he was stating his political opinion. ECF No. 66-4 at 3.

investigations conducted by Lt. Baird: the investigation into Plaintiff and the investigation into Corporal O'Neal following his wife's citizen complaint. *See* ECF No. 69-1.

The undersigned concludes that Plaintiff has not presented direct or circumstantial evidence sufficient to survive summary judgment as to a mixed-motive method of proving race or sex discrimination. First, Plaintiff has not forecast evidence of a sexually discriminatory attitude, such that a mixed-motive claim based on sex must fail. Moreover, assuming without deciding that Lt. Baird's Facebook statements reflect a racially discriminatory attitude, *see Thomas*, 715 F. App'x at 302, they were made years after Plaintiff's termination and were not related in any way to Plaintiff or her termination. Accordingly, Plaintiff has not demonstrated a "nexus between that negative attitude and the employment action." *Brinkley*, 180 F.3d at 608 ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.") (internal quotation marks omitted). Furthermore, as discussed fully above, the record evidence related to Corporal O'Neal does not raise an inference of discrimination. *See* Discussion I.A.1, *supra*. Accordingly, the undersigned concludes that Plaintiff has failed to raise a genuine issue of material fact or create any inference that race or sex was a motivating factor in her termination.

For the foregoing reasons, the undersigned concludes that based on the evidence presented, no rational fact-finder could conclude that Plaintiff's termination was discriminatory. Accordingly, it is recommended that Defendant's Motion be granted as to Plaintiff's Title VII and § 1981 disparate treatment claims.[11]

---

[11] Although the title of Plaintiff's First Cause of Action lists "Retaliation," Plaintiff does not make any arguments regarding retaliation. Indeed, Plaintiff's Response uses the word "retaliation" only

## II.    Claims for Hostile Work Environment and Harassment

Plaintiff also alleges liability under both Title VII and § 1981 based on a hostile work environment. Defendants argue that Plaintiff's evidence is not sufficient to establish a hostile work environment claim based on either her race or her sex. ECF No. 59-1 at 9–11.

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). To establish a hostile work environment claim under § 1981 or Title VII, Plaintiff must show (1) unwelcome conduct (2) based on Plaintiff's race or sex (3) that was sufficiently severe or pervasive to alter Plaintiff's conditions of employment and to create an abusive work environment, and (4) that is imputable to Plaintiff's employer. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (explaining that the elements of a hostile work environment claim "are the same under either § 1981 or Title VII").

---

once. ECF No. 66 at 19 ("In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendants is not its true reason, but was pretext for discrimination or retaliation.") (citing *Reeves*, 530 U.S. at 143). To succeed on a retaliation claim under the burden-shifting framework, Plaintiff must first establish that (1) she engaged in activity protected under Title VII or § 1981, (2) her employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action. *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457–58 (4th Cir. 1989) (applying same *prima facie* framework to Title VII and § 1981 retaliation claims). To the extent Plaintiff alleged a retaliation claim in her Amended Complaint, the undersigned finds that she has failed to forecast evidence sufficient to show either that she engaged in protected activity or a causal connection between any protected activity and an adverse employment action, such that she cannot establish a prima facie case of retaliation.

Evidence that a plaintiff informed management or her coworkers that she found the conduct to be offensive is sufficient to establish that the conduct was unwelcome, as required by the first element. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008). With respect to the second element, "[i]n order for a Title VII plaintiff to survive summary judgment, [s]he must present sufficient evidence that the harassing conduct was motivated by [racial or sexual] animosity." *Id.* (citation and internal quotation marks omitted).

Regarding the third element, to establish that the conduct was "sufficiently severe or pervasive," a plaintiff must demonstrate not only that she subjectively perceived the environment to be abusive, but also that a reasonable person in her position would have found the environment objectively hostile or abusive. *Id.* at 315. The Supreme Court has "directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris*, 510 U.S. at 23).

Finally, to establish the fourth element, a plaintiff must demonstrate some basis for imposing liability on the employer. *Sunbelt Rentals, Inc.*, 521 F.3d at 319. In a case where an employee is harassed by a coworker, "the employer is liable only if it was negligent in controlling working conditions." *Boyer-Liberto*, 786 F.3d at 278 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)); *see Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir. 2003) (en banc) ("[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it."). Where the harasser is the victim's supervisor, however, the employer is strictly liable for the supervisor's harassing behavior if it

culminates in a tangible employment action, but otherwise "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Boyer-Liberto*, 786 F.3d at 278 (quoting *Vance*, 570 U.S. at 424). "For purposes of the employer's vicarious liability, the harasser qualifies as a supervisor, rather than a co-worker, if he or she is empowered to take tangible employment actions against the victim . . . such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*

**A.  Title VII and § 1981 Claims for Hostile Work Environment Based on Race**

In support of her claim for hostile work environment based on race, Plaintiff points only to her deposition testimony where she averred that she was described as a "black female" and that she complained to her supervisor about being sent to predominantly black neighborhoods during her shift. ECF No. 66 at 27–28; ECF No. 69-10 at 13 (testifying, "Well, they were saying that I was one of the black females that they had on the shift. And a lot of times they would send me to a neighborhood that was just dominant black, 'Pick Nelson, she'll be a good one to go there.'"). She told her supervisor that the reason she asked for backup was because she felt that this shift assignment was racial disparagement. ECF No. 69-10 at 13. Plaintiff has not produced any other evidence supporting her claim of racial harassment.

The undersigned concludes that Plaintiff has failed to establish her racial harassment claim. For purposes of this Motion, the undersigned assumes that Plaintiff's evidence is sufficient to create a genuine dispute of fact regarding the first, second, and fourth elements. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (complaining to supervisor about

perceived harassment was evidence that conduct was "unwelcome" and, for purposes of liability, that employer was on notice of the alleged harassment). However, Plaintiff has failed to produce evidence sufficient to demonstrate objectively severe or pervasive unwelcome conduct based on her race. The only evidence Plaintiff has proffered in support of her racial harassment claim is that she was described as a black woman and that she would be assigned to go to predominantly black neighborhoods. Even assuming, for purposes of this Motion, that this shift assignment occurred frequently, the undersigned concludes that this conduct does not rise to the level of severe or pervasive, as it is not severe, physically threatening[12] or humiliating, and there is no evidence that it unreasonably interfered with Plaintiff's work performance. *See Harris*, 510 U.S. at 23.

At best, Plaintiff may have identified discrete acts of discrimination, but such acts of discrimination "cannot be transformed, without more, into a hostile work environment claim." *Talent v. Comm'r of Pub. Works*, No. 2:12-CV-0622 DCN, 2014 WL 971747, at *13 (D.S.C. Mar. 11, 2014) (quoting *KilbyRobb v. Spellings*, 522 F. Supp. 2d 148, 164 (D.D.C. 2007)); *see also Gordon v. Gutierrez*, No. 1:06 CV 861, 2007 WL 30324, at *6 (E.D. Va. Jan. 4, 2007) ("Dissatisfaction with work assignments and one incident of verbal counseling regarding workflow management falls far short of an objectively abusive work environment."), *aff'd*, 250 F. App'x 561 (4th Cir. 2007); *Williams v. Morris*, 956 F. Supp. 679, 689 (W.D. Va. 1996) ("At most, [former police officer's] beat was an unpopular and stressful assignment, . . . [and it] may even be said that the defendants discriminated against [the officer] in his work assignment, but this is not the same as creating a hostile work environment[.]"). Accordingly, the undersigned finds that Plaintiff has

---

[12] The undersigned recognizes that law enforcement work in general may pose physical threats to any officer.

failed to establish a racially hostile work environment, such that her § 1981 hostile work environment claim and her Title VII racial harassment claim should be dismissed.

### B. Title VII Claim for Hostile Work Environment Based on Sex

In support of her Title VII claim for hostile work environment based on sex, Plaintiff again relies exclusively on her deposition testimony. ECF No. 66 at 27–28. She points to her testimony that she was repeatedly called a "female stud." ECF No. 66 at 27 (citing Pl. Dep. at 29). She also testified that she heard officers repeatedly refer to Jennifer, another lesbian officer, as "a disgrace" and "not someone you'd want to back you up." *Id.* (citing Pl. Dep. at 23, 29); ECF No. 69-10 at 4–7, 10. Finally, Plaintiff points to her testimony that she never reported any of the offensive comments because she saw Jennifer "railroad[ed]" for reporting derogatory comments.[13] *Id.* (citing Pl. Dep. at 30–31); *see* ECF No. 69-10 at 5–7, 10–11 (testifying that she never complained to any supervisor or Command Staff about the "female stud" comments or comments made about Jennifer).

Having reviewed the evidence and argument, the undersigned finds that Plaintiff has not established her claim for hostile work environment based on sex. For purposes of this Motion, Plaintiff has produced sufficient evidence to establish a question of fact regarding the second element—that the conduct was based on her sex. Second, although Plaintiff has not proffered any

---

[13] Plaintiff also states that "for over a year she was sexually harassed by a superior who responded to her complaints and refusal to engage in inappropriate discussions with him by writing her up for fictitious policy violations." ECF No. 66 at 28; *see also id.* at 30 (stating that "one of Ms. Nelson's harassers was a supervisor that punished her via write ups for refusing his inappropriate advances"). However, although Plaintiff cites to page 43 of her deposition to support this assertion, that page is not in the record. Moreover, Plaintiff's Amended Complaint does not contain any allegation regarding inappropriate discussions, advances, or writeups by a supervisor, and the undersigned's review of the record did not reveal any evidence supporting this allegation. *See generally* ECF No. 52.

evidence that she informed management or her coworkers that she found any of the comments to be offensive, the undersigned finds that Plaintiff's testimony creates a question of fact regarding whether the conduct was unwelcome or whether her employer can be liable for the conduct.[14] *See Sunbelt Rentals, Inc.*, 521 F.3d at 314.

With respect to the third element, Plaintiff has produced sufficient evidence that she subjectively found the conduct offensive. However, Plaintiff must "clear a high bar" to satisfy the objectively severe or pervasive test, *id.* at 315–16, and the undersigned finds she has not done so.

The Supreme Court and Fourth Circuit have made clear that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)); *Perkins*, 936 F.3d at 208. Thus, the court's "task . . . on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Sunbelt Rentals, Inc.*, 521 F.3d at 316 (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc)).

---

[14] Plaintiff testified that she never reported or complained about the perceived harassment to a supervisor or anyone in the chain of command. In her Response, she argues, without citing evidence, that the department "failed to provide avenues for reporting of discrimination." ECF No. 66 at 30. However, according to her testimony, officers were supposed to complain to their immediate supervisor or their sergeant before going to anyone else in the chain of command and that she was told repeatedly that the Sheriff had an open-door policy. ECF No. 69-10 at 6, 12. Thus, there is evidence in the record that there were available avenues for reporting discrimination. Nonetheless, Plaintiff also testified that the comments about Jennifer were made by both coworkers and some supervisory level officers, suggesting that her employer may have been on notice of those comments.

In support of the severe and pervasive element, Plaintiff argues that "the harassment occurred continuously over the course of [her] employment and in aggregate created a hostile working environment." ECF No. 66 at 27. She testified that she first heard the "female stud" comment in 2006 and that "it was a continuous thing," and she testified that she heard comments about Jennifer multiple times a year. ECF No. 69-10 at 5, 11. However, there is no evidence that she found these comments intimidating, humiliating, or physically threatening. *See Harris*, 510 U.S. at 23. Although Plaintiff argues that, in fact, she was offended by the term "female stud," the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (internal quotation marks omitted) (citing *Harris*, 510 U.S. at 21; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

Nor is there evidence that she ever told anyone that she found this conduct to be unwelcome; to the contrary, she testified that she never reported or complained about the comments. ECF No. 69-10 at 5–7, 10–11. Furthermore, there is no evidence that these comments unreasonably interfered with Plaintiff's work performance. *See Harris*, 510 U.S. at 23. Indeed, Plaintiff presented evidence that she "performed at a consistently high level, as reflected on her performance evaluations which show she received overall ratings of 'exceeds expectations' and 'meets expectations' throughout her employment." ECF No. 66 at 16 (citing Ex 21, Evaluations and Emails).

Looking at the totality of the circumstances, the undersigned concludes that the comments, while made repeatedly during Plaintiff's tenure, are not sufficient to show a severe or pervasive hostile work environment.

Plaintiff has not produced any other evidence of unwelcome conduct based on her sex. There are no allegations or evidence of any severe, physical, or threatening conduct or of any adverse employment action taken against Plaintiff other than her termination. Furthermore, Plaintiff did not testify or produce evidence that Lt. Baird, Captain Averill, Sheriff Tanner, or any of the officers involved in the Command Review ever made any of the comments. On this record, the undersigned concludes that no reasonable jury would find Plaintiff's working environment "to be so out of the ordinary as to meet the severe or pervasive criterion," such that the environment "was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate." *See Sunbelt Rentals, Inc.*, 521 F.3d at 316 (internal quotation marks omitted). Accordingly, the undersigned recommends that Defendant's Motion be granted as to Plaintiff's Title VII hostile work environment claim.

### III.    Claim for Equal Protection Violation under the Fourteenth Amendment

Plaintiff's third cause of action asserts a claim, pursuant to 42 U.S.C. § 1983,[15] for violation of the Fourteenth Amendment's Equal Protection Clause. Plaintiff's Equal Protection claim largely mirrors her Title VII claim, and both Plaintiff and Defendants rely on their arguments and evidence set forth in the Title VII section to address the merits of Plaintiff's Equal Protection Claim. As with the Title VII claim, Defendants argue that Plaintiff has failed to create a question of material fact regarding whether Plaintiff's termination was the result of disparate treatment on the basis of her race or sex. ECF No. 59 at 2. The undersigned agrees.

---

[15] "Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted).

Title VII does not provide the exclusive remedy for discrimination in employment, and "public employees are entitled to bring a § 1983 action asserting Equal Protection claims." *Campbell v. Galloway*, 483 F.3d 258, 272 n.5 (4th Cir. 2007). The Equal Protection Clause of the Fourteenth Amendment commands that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional imperative of equal protection does not entirely remove the States' power to classify but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see Wilcox v. Lyons*, 970 F.3d 452, 458 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2754 (2021).

"To succeed on an equal protection claim, a plaintiff must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. *Id.* Distinctions on the basis of sex are subject to heightened scrutiny under equal protection analysis, *see Knussman v. Maryland*, 272 F.3d 625, 635 (4th Cir. 2001), while distinctions on the basis of race are subject to the strictest judicial scrutiny because racial classifications "are simply too pernicious to permit any but the most exact connection between justification and classification." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 240–41 (4th Cir. 2010) (citation and internal quotation marks omitted).

Plaintiff's § 1983 Equal Protection claim fails for the same reasons as her Title VII claims. The Fourth Circuit has held that a claim brought pursuant to § 1983 should be analyzed consistent with those principles that govern consideration of Title VII claims. *See Lightner*, 545 F.3d at 263 n.*; *Love–Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). As set forth above, Plaintiff cannot

point to any evidence that her termination was the result of disparate treatment or that she was discriminated or harassed on the basis of her race or sex. Based on the same reasoning employed in recommending summary judgment on Plaintiff's Title VII claims, the undersigned recommends that Defendants be granted summary judgment on Plaintiff's Equal Protection claim. *See Cronin v. S.C. Dep't of Corr.*, No. CA 3:11-471-MBS-SVH, 2013 WL 5315891, at *7 (D.S.C. May 14, 2013), *report and recommendation adopted as modified*, No. CA 3:11-471-MBS-SVH, 2013 WL 5315983 (D.S.C. Sept. 20, 2013).

## IV.    Claim for Due Process Violation under the Fourteenth Amendment

Plaintiff's fourth cause of action alleges that Defendants Baird and Tanner violated Plaintiff's constitutional rights under the Due Process Clause of the Fourteenth Amendment when they terminated her employment as deputy without providing her the opportunity to file a grievance or have a hearing in relation to the termination. Defendants move for summary judgment, arguing that Plaintiff cannot establish this claim. The undersigned agrees.

As Defendants correctly note, the Constitution does not mandate that employers provide at-will employees with grievance rights. ECF No. 59-1 at 12. Indeed, a public employee cannot invoke the procedural protections of the Due Process Clause unless she can demonstrate that she has been deprived of a liberty or property interest protected by the clause. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972). "It is axiomatic that South Carolina is an at-will employment state," *McMillan v. Pee Dee Reg'l Airport Comm'n*, 705 F. Supp. 2d 496, 500 (D.S.C. 2010), and Plaintiff has not forecast any evidence showing that her at-will status had been altered. As an at-will employee, Plaintiff's "subjective expectancy of continued employment" does not constitute a liberty or property interest protected by the Due Process Clause. *Bane v. City of Columbia*, 480 F. Supp. 34, 37 (D.S.C. 1979) (internal citations omitted); *see also Jenkins v.*

*Weatherholtz*, 909 F.2d 105, 107 (4th Cir. 1990) (explaining that "government employee serving 'at the will and pleasure' of the government employer has no legitimate expectancy of continued employment and thus has no protectible property interest"). Accordingly, Plaintiff's due process claim fails as a matter of law.

**V.     Defamation Claim.**

Plaintiff's final cause of action is a state-law defamation claim against Defendants Tanner and Baird alleging that they "published or caused to be published numerous statements concerning Plaintiff, her employment, and the circumstances of her termination" that "tended to impeach Plaintiff's honesty, integrity, virtue, and reputation." ECF No. 52 at ¶¶ 119–20. According to Plaintiff, these allegedly defamatory statements were made in the PCS form sent to the CJA after Plaintiff's termination, the IA Report, the polygraph examination report, and various articles published in the *Island Packet* newspaper. *Id.* at ¶ 119.

Plaintiff further alleges that, sometime between the December hearing and January 3, 2018, Defendants leaked to the *Island Packet* the existence of Plaintiff's IA investigation and a video recording of her polygraph exam. *Id.* at ¶ 59. Record evidence shows that on January 3, 2018, a reporter with the *Island Packet* submitted a Freedom of Information Act ("FOIA") request to BCSO for a complete copy of Plaintiff's personnel file and the entire internal affairs investigation that resulted in her termination, including any videos. ECF No. 59-8 at 13. Plaintiff alleges that Defendants then "published to the *Island Packet* the incomplete and shoddy Internal Affairs report and the video recording of Plaintiff's procedurally flawed polygraph interview." ECF No. 52 at ¶ 61. She asserts that "these documents knowingly, intentionally, or recklessly cast Plaintiff in a negative and false light" because the report and video "failed to note the corroboration of Plaintiff's recollections by Lindsay Vargas and the fraudulent nature of the Emma Lipinski email." *Id.*

Finally, Plaintiff alleges that on January 21, 2018, the *Island Packet* published a story about Plaintiff that damaged Plaintiff's reputation. *Id.* at ¶ 62; *see* ECF No. 66-9.

"The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff." *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 514 S.E.2d 126, 133 (S.C. 1999). Slander is spoken defamation, and libel is written defamation. *Holtzscheiter v. Thomson Newspapers, Inc.*, 506 S.E.2d 497, 501 (S.C. 1998). To establish a claim for defamation under South Carolina law, a plaintiff must show the following elements: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault on the defendant's part in publishing the statement; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *McNeil v. S.C. Dep't of Corr.*, 743 S.E.2d 843, 848 (S.C. Ct. App. 2013); *Parrish v. Allison*, 656 S.E.2d 382, 388 (S.C. Ct. App. 2007). "In defamation actions involving a public official or public figure, the plaintiff must prove the statement was made with actual malice." *Elder v. Gaffney Ledger*, 533 S.E.2d 899, 901 (S.C. 2000) (citations omitted); *see Fields v. Richland Cty. Sheriff's Dep't*, No. 3:17-CV-0443-MGL-TER, 2018 WL 4560538, at *4 (D.S.C. May 25, 2018), *report and recommendation adopted*, No. CV 3:17-0443-MGL-TER, 2018 WL 4001830 (D.S.C. Aug. 22, 2018).

Defendants move for summary judgment on this claim, arguing that Plaintiff has failed to produce evidence establishing the elements of a cause of action for defamation. ECF Nos. 59 at 2; 59-1 at 14–18. Defendants further argue that, because Plaintiff is a public official, she must prove actual malice to recover on a claim of defamation, which she has not done. *Id.* They also argue that Plaintiff's allegation as it relates to defamation for publishing the PCS form is statutorily

barred by S.C. Code Ann. § 23-23-90;[16] that statements made in the IA Report, polygraph examination report and other items contained in the personnel file of the Sheriff's Department are protected by a qualified privilege; that there is no evidence that Defendants "leaked" any information to the *Island Packet*; and that none of the information contained in the reports are defamatory in nature. *Id.*

The undersigned agrees with Defendants that Plaintiff has failed to produce evidence establishing the elements of her defamation claim. Regarding the information published in the *Island Packet*, Plaintiff has not produced any evidence that Sheriff Tanner, Lt. Baird, or anyone else at the BCSO "leaked" any information to the newspaper. Indeed, the only evidence in the record is that a reporter from the Island Packet made a FOIA request for Plaintiff's personnel file and the IA records. Although Plaintiff alleges that someone told the newspaper to specifically request the IA records and videos in a FOIA request, she has offered no evidence that this someone is either Baird or Tanner. Indeed, there appears to be no evidence, other than Plaintiff's speculation, that a tip was even made to the press. However, to survive summary judgment, Plaintiff "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 311.

---

[16] S.C. Code Ann. § 23-23-90, which appears in the Chapter on Law Enforcement Training Council and Criminal Justice Academy, provides:

> An oral or written report, document, statement, or other communication that is written, made, or delivered concerning the requirements or administration of this chapter or regulations promulgated pursuant to it must not be the subject of or basis for an action at law or in equity in any court of the State if the communication is between: (1) law enforcement agencies, their agents, employees, or representatives; or (2) law enforcement agencies, their agents, employees, or representatives and the academy or the council.

Moreover, Plaintiff does not dispute Defendant's argument that any claim based on the PCS form sent to the CJA is statutorily barred pursuant to S.C. Code Ann. § 23-23-90. Notably, in her Response in opposition to Defendants' Motion, Plaintiff responds only to Defendants' argument that the statements made in the IA Report, the polygraph exam report, and the personnel file are protected by a qualified privilege. *See* ECF No. 66 at 34–35 (contending, without citation to the record, that "[t]here is ample evidence based on the facts of this case to find that the Defendants were not acting in good faith and their actions went further than their interest or . . . duties required"). She does not, however, rebut Defendants' argument that "[t]here is no statement made in these reports that can be shown to be false." ECF No. 59-1 at 18 (noting that Plaintiff "made a statement relative to the complaint at the Oreck store, a polygraph was performed, deception was indicated, and she later admitted that her statement was not completely accurate in that she did say the word 'ass' but in a different context and that she did raise her voice but not to the fullest extent when she had previously denied those allegations"). Moreover, although Plaintiff does not dispute that, as a police officer, she was considered a public official, *see generally* ECF No. 66 at 34–35; *see also McClain v. Arnold*, 270 S.E.2d 124, 125 (S.C. 1980) (holding police officer was "public official" for purposes of defamation action brought in connection with report of supposed false arrest), she has not proffered any evidence that any of the statements made in the BCSO files were made with actual malice.

Upon considering the parties' arguments and the evidence in the record, the undersigned concludes that Plaintiff has failed to establish all of the essential elements of her defamation claim against Baird and Tanner. Accordingly, it is recommended that Defendants' Motion be granted as to Plaintiff's defamation claim. *See Celotex Corp.*, 477 U.S. at 322 (explaining that Rule 56 mandates the entry of summary judgment "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## <u>CONCLUSION</u>

For the reasons set forth above, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment, ECF No. 59, be **GRANTED**.

The parties are referred to the Notice Page attached hereto.


November 23, 2021
Charleston, South Carolina

Molly H. Cherry
United States Magistrate Judge

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).